1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11   UNITED STATES OF AMERICA,

12                    Plaintiff,

13           v.

14   KENNETH BASH, et al.,

15                    Defendants.

16

Case No.: 1:20-cr-00238 JLT SKO

ORDER ON MOTIONS IN LIMINE

(Docs. 1441, 1442, 1446, 1447, 1448,
1450-1460, 1491-1501, 1558, 1570, 1649)

17          The criminal trial of Defendants Kenneth Johnson, Francis Clement, John Stinson, and

18   Brandon Bannick is scheduled to commence on January 14, 2024. The parties have submitted

19   several motions in limine regarding evidence expected to be presented at trial. The Court held a

20   hearing on the motions on January 6, 2024. Andrea Lee Luem appeared on behalf of Mr. Johnson;

21   Jane Fisher-Byrialsen and Jean deSalles Barrett appeared on behalf of Mr. Clement; Kenneth

22   Reed appeared on behalf of Mr. Stinson; and Mr. Bannick appeared *in propia persona*. Having

23   considered the entire record, the Court rules as follows.

24   **I.      BACKGROUND**

25          The Government alleges that each of the Defendants conspired to commit racketeering

26   due to their conduct, which was taken for the benefit of the Aryan Brotherhood criminal

27   enterprise. (*See generally* Doc. 1098.) The "Aryan Brotherhood is a white, race-based gang that

28   was formed in the California prison system in about 1964 by white inmates who wanted to gain

power and authority in prison." (*Id*. at 2 ¶ 4.) The AB "is a criminal organization whose members and associates engaged in drug trafficking, theft, and acts involving murder, extortion, burglary, robbery, and assault." (*Id*. ¶ 1.) According to the Government, the purpose of the AB is to control illegal activities within the California prison system, to enrich its leaders, members, and associates, to preserve, protect and expand the reach of the AB's power and to use threats and violence to "keep victims in fear of the AB." (*Id*. at 4 ¶ 14.) The AB is run by a "three-man commission with authority over the entire enterprise" and achieves its ends by authorizing and condoning members and associates to murder, intimidate, and assault those who jeopardize the AB's operations. (*Id*. at 3-5 ¶¶ 7, 15.) Likewise, "[m]embers who do not fulfill their obligations to the AB are subject to murder." (*Id*. at 4 ¶ 10.)

In Count 1 of the operative indictment, the Government alleges that the four Defendants set for trial in January 2025, among others[1], conspired to participate in a racketeering enterprise. (Doc. 1098 at 5-14.) In support of the RICO conspiracy count, the Government alleges that the racketeering activities consisted of multiple acts involving murder, extortion, robbery, kidnapping, identity theft, fraud, drug trafficking, and arson. (*Id*. at 6.) Toward this end, the Government alleges that the murders set forth in Counts 2 through 6, among others, were acts committed during and in furtherance of the RICO conspiracy. (*See id*. at 7-9 ¶ 20.)

In Counts 2 and 3, the Government has charged Messrs. Johnson, Clement, and Bannick with murder in aid of racketeering. (Doc. 1098 at 14-15.) The Government alleges that these Defendants murdered, and aided and abetted the murder of, Victim-1 and Victim-2 on October 4, 2020. (*Id*.) In Count 4, the Government alleges that Mr. Clement murdered Victim-10 on February 22, 2022. (*Id*. at 15-16.) In Counts 5 and 6, the Government alleges Messrs. Clement and Bannick murdered Victim-11 and Victim-12 on March 8, 2022. (*Id*. at 16-17.)

## II.      LEGAL STANDARDS

"A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (citation

---

[1] For purposes of this order, the Court does not refer to the remaining defendants charged in the Third Superseding Indictment.

2

omitted). "Although the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citations omitted).

The Ninth Circuit explained that motions in limine "allow parties to resolve evidentiary disputes ahead of trial, without first having to present potentially prejudicial evidence in front of a jury." *Brodit v. Cabra*, 350 F.3d 985, 1004-05 (9th Cir. 2003) (citations omitted). However, "a motion in limine should not be used to resolve factual disputes or weigh evidence," *C & E Services, Inc. v. Ashland Inc*., 539 F. Supp. 2d 316, 323 (D.D.C. 2008), as that is the province of the jury. *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150 (2000). The Court will bar use of the evidence in question only if the moving party establishes that the evidence clearly is not admissible for any valid purpose. *Jonasson v. Lutheran Child & Family Services*, 115 F.3d 436, 440 (7th Cir. 1997). On the other hand, the rulings on the motions in limine do not preclude either party from arguing the admissibility of the evidence discussed herein, if the evidence adduced at trial demonstrates a change of circumstances that would make the evidence admissible. In this event, the proponent of the evidence **SHALL** raise the issue with the Court outside the presence of the jury.

## III.   ANALYSIS

### A.   Rule 404(b) Issues

"Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, Rule 404(b) is inapplicable to other acts evidence that is "directly related to, or inextricably intertwined with, the crime charged in the indictment." *United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003). "Evidence is 'inextricably intertwined' when it either constitutes a portion of the transaction giving rise to the criminal charge, or is necessary to allow the prosecution 'to offer a coherent and comprehensible story regarding the commission of the crime.'" *United States v. Yandell*, 2024 WL 694373, at *2 (E.D. Cal. Feb. 20, 2024) (quoting *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th Cir. 1995)). "There must be a sufficient contextual or substantive connection between the proffered

3

1   evidence and the alleged crime to justify exempting the evidence from the strictures of Rule

2   404(b). *Vizcarra-Martinez*, 66 F.3d at 1013.

3        For instance, to establish guilt under 18 U.S.C. § 1962(d), or RICO conspiracy, the

4   Government must present "adequate proof of an overall conspiracy to participate, directly or

5   indirectly, in the conduct of the [enterprise's] affairs through a pattern of racketeering." *United*

6   *States v. Jaimez*, 45 F.4th 1118, 1129-30 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1038, 215 L. Ed.

7   2d 198 (2023) (quoting *United States v. Fernandez*, 388 F.3d 1199, 1226 n.18 (9th Cir. 2004),

8   *modified*, 425 F.3d 1248 (9th Cir. 2005); 18 U.S.C. § 1962(c)). In a conspiracy case, the court in

9   *Yandell* explained:

10          [T]he government "may submit proof on the full scope of the
            conspiracy; it is not limited in its proof to the overt acts alleged in
11          the indictment." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir.
            2011); *see also United States v. Nelson*, No. 17-CR-00533, 2023 WL
12          4004113, at *17 (N.D. Cal. June 13, 2023) (citing *Rizk* with approval
            in RICO conspiracy case). This proof may include uncharged acts,
13          *see United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994), and acts
            defendants did not personally commit, *see United States v. Jaimez*,
14          45 F.4th 1118, 1130 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1038
            (2023).

15   2024 WL 694373, at *2. Therefore, any evidence that bears on the full scope of the conspiracy is

16   inextricably intertwined with the charged acts or is direct evidence of the crimes charged and is

17   not subject to the requirements of 404(b).

18              1.      Motion to Exclude Unnoticed 404(b) Evidence (Doc. 1442)

19        Mr. Johnson moves in limine to exclude any uncharged misconduct, or "prior bad acts,"

20   evidence the Government may attempt to introduce that was not included in its Rule 404(b)

21   notice. (Doc. 1442 at 1-2.) The motion, joined in by Messrs. Clement and Bannick (Docs. 1471,

22   1488), asserts that the Government's notice listed a single act against co-defendant Evan Perkins[2]

23   despite the Government's exhibit and witness disclosures indicating that its case-in-chief will

24   include the testimony of 83 witnesses and suggesting the Government will seek to admit "dozens"

25   of other "bad acts" by Defendants that the Government neither charged in the indictment nor

26   noticed under Rule 404(b). (Doc. 1442 at 1-2.) Specifically, the defense has a "good-faith belief"

27   that the Government will offer evidence related to homicides, conspiracies to commit homicides,

28   ───────────────
[2] Mr. Perkins has been severed from the January trial. (*See* Doc. 1626.)

4

1  and other violent conduct not charged or noticed, such as recorded conversations with

2  cooperating witnesses, images, and incident reports. (*Id.* at 2, 4.)

3       The Government does not challenge Mr. Johnson's assertion that evidence introduced

4  under Rule 404(b) must comply with the Rule's notice requirements.[3] Rather, it responds that any

5  "bad acts" evidence it may seek to introduce is admissible as direct evidence of the crimes

6  charged in the indictment—specifically the RICO conspiracy charge. (Doc. 1549 at 1-2.)

7       The racketeering activity alleged in connection with the RICO conspiracy charge includes

8  "multiple acts" by various Defendants involving murder, extortion, robbery, kidnapping, identity

9  theft, fraud, drug trafficking, and arson. (Doc. 1098 at 6.) Therefore, any evidence that bears on

10 the full scope of the conspiracy is inextricably intertwined with the charged acts or is direct

11 evidence of the crimes charged and thus, not subject to the requirements of 404(b). As to any

12 unnoticed 404(b) evidence that does not constitute the acts alleged in the indictment, whether as a

13 predicate act or an act in furtherance of the substantive crime, Mr. Johnson's motion (Doc. 1442),

14 joined in by Messrs. Clement and Bannick (Docs. 1471, 1488), is **GRANTED**. Otherwise, should

15 the Government seek to introduce uncharged acts as direct evidence of the crimes charged, it has

16 significant latitude to do so. To this extent, the motion is **DENIED**.

17              2.      Motion to Exclude Cell Search Evidence (Doc. 1649)

18      Mr. Clement moves, under Rules 404(b), 401, and 403, to exclude evidence of searches

19 conducted of his and other co-defendants' cells at the Fresno County Jail on November 1, 2023.

20 (Doc. 1649 at 1.) He argues that this evidence—which includes testimony of participating officers

21 and photographs of recovered items—involves an incident "well outside the temporal scope of the

22 charged conspiracy" and unrelated to the furtherance of that conspiracy. (*Id.* at 2.) Thus, he

23 asserts that this "bad acts" evidence is not "inextricably intertwined" with the conspiracy charge

24 such that the Government may rely on it to prove the existence of the conspiracy. (*Id.*) The

25 Government opposes the motion. (Doc. 1653.)

26      According to Mr. Clement, medication and medical supplies were found in his and Mr.

27

28 ───────────────
   [3] The Court notes that Rule 404(b)(3) also permits notice "in any form during trial if the court, for good
   cause, excuses lack of pretrial notice." Fed. R. Evid. 404(b)(3)(C).

5

1    Johnson's cells, contraband other than a weapon was recovered from co-defendant Perkins' cell,

2    and a shank hidden in a false compartment at the bottom of a file folder was discovered in co-

3    defendant Gray's cell. (Doc. 1649 at 1-2.) The Government has indicated its intent to call as

4    witnesses five Fresno County Sheriff Officers who participated in the searches, and to offer as

5    exhibits three photographs of the shank and false bottom file folder discovered in Mr. Gray's cell.

6    (*Id.*)

7          The indictment alleges the conspiracy began "at a time unknown, but no later than in or

8    around 2015" and continued "to at least on or about March 1, 2023." (*Id.*) Mr. Clement contends

9    that "[e]vidence of acts outside the charged conspiracy period are admissible only if relevant to

10    proving the existence of the conspiracy or the roles of the defendants within it." (Doc. 1649 at 2,

11    citing *United States v. Cervantes*, 170 F. Supp. 3d 1226 (N.D. Cal. 2016).) The Government, on

12    the other hand, argues that the "at least" language in the indictment does not mean the RICO

13    conspiracy ended on March 1, 2023. (Doc. 1653 at 2 n.1.) Rather, at the motions in limine

14    hearing, the Government argued that the weapon possession is directly related to ongoing

15    enterprise activity, particularly as it pertains to AB members' intimidation and violence against

16    those who cooperate with authorities or do not obey the rules of the AB. Thus, the Government

17    appeared to be arguing the language of the indictment demonstrates perhaps a broader scope of

18    the charged conspiracy that would connect it to this continuing enterprise evidence.

19          The Government also asserted that once testimony is heard, the Court and the parties will

20    further understand the relation of this evidence to the conspiracy. Thus, without context, the Court

21    **RESERVES** ruling on the motion until the Government making a showing that this evidence

22    bears on the rest. The Government SHALL do so prior to producing it at trial, outside the

23    presence of the jury.

24          **B.    Expert and Lay Opinion Issues**

25                 1.    Expert opinion testimony

26          "A witness who is qualified as an expert by knowledge, skill, experience, training, or

27    education may testify" if it is "more likely than not" that:

28

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

After determining the witness is qualified to offer expert testimony within the meaning of Rule 702, the district court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). "To satisfy its gatekeeping duty under *Daubert*, the court must make an explicit reliability finding." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1190 (9th Cir. 2019) (internal quotation marks omitted).

### 2.    Lay opinion testimony

Under Federal Rule of Evidence 701, a witness who is not testifying as an expert may offer testimony in the form of an opinion if it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

In applying Rule 701 to the lay opinion testimony of law enforcement officers, the Ninth Circuit has held that an investigator's interpretation of intercepted phone calls may meet Rule 701's "perception" requirement when it is an interpretation "of ambiguous conversations based upon [the investigator's] direct knowledge of the investigation." *United States v. Gadson*, 763 F.3d 1189, 1206 (9th Cir. 2014) (internal citations and quotations omitted). "Lay witness testimony regarding the meaning of ambiguous conversations based on the witness's direct perceptions and experience may also prove 'helpful to the jury' for purposes of Rule 701." *Id.* at 1207. *United States v. Freeman*, 498 F.3d 893, 904-05 (9th Cir. 2007), offers a helpful example concerning the testimony of Agent Bob Shin regarding coded communications:

The record reveals that the majority of [Agent] Shin's lay testimony

7

> consisted of his interpretations of ambiguous conversations based upon his direct knowledge of the investigation. Although … Shin was not a participant in the conversations he interpreted, his understanding of ambiguous phrases was based on his direct perception of several hours of intercepted conversations—in some instances coupled with direct observation of Mitchell and Brown—and other facts he learned during the investigation. . . Such testimony also proved helpful to the jury in determining what Freeman, Mitchell, and Brown were communicating during the recorded telephone calls.

*Freeman*, 498 F.3d at 904-05. There are some exceptions:

> As the drafters of Rule 701 noted, "meaningless assertions which amount to little more than choosing up sides" should be excluded for lack of helpfulness. Fed. R. Evid. 701 advisory committee's note. In addition, testimony that relies on or conveys hearsay evidence, such as when an officer relies on the truth of a third party's statement as the basis for an interpretation of a statement in an intercepted phone call, is also inadmissible, both because it would not be based on the officer's own perceptions, and would not be helpful.

*Gadson*, 763 F.3d at 1208 (internal citations omitted). An investigator also may not offer a lay opinion as to a defendant's "culpable role" in a conspiracy if the opinion relies on the entirety of information gathered in an investigation, as this this improperly strays into the province of the jury. *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2004).

>    3.    Motion to Preclude Expert Testimony through Lay Witnesses (Doc. 1458)

Messrs. Clement and Johnson, joined by Messrs. Stinson and Bannick, request notice of any "dual capacity" witnesses—those testifying as both a lay person and an expert—the Government intends to call at trial and seek an order prohibiting expert opinions offered by lay witnesses. (Docs. 1458, 1465, 1488.) The Government opposes the motion. (Doc. 1547.)

The Advisory Committee articulated Defendants' concern about this type of testimony:

> Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.... [T]he amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in … Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a layperson.

Fed. R. Evid. 701 advisory committee's note to 2000 amendment. The Ninth Circuit has "cautioned about the dangers of allowing a case agent to offer both expert and lay opinion

8

testimony." *United States v. Torralba-Mendia*, 784 F.3d 652, 658 (9th Cir. 2015). For example, a law enforcement officer may properly testify as an expert in the "drug jargon" used by the defendants/within the conspiracy as well as a lay witness, provided he was involved in the investigation. *See Freeman,* 498 F.3d 893, 904 (9th Cir. 2007). However, his "status as an expert could lend him unmerited credibility when testifying as a percipient witness, cross-examination might be inhibited, jurors could be confused and the agent might be more likely to stray from reliable methodology and rely on hearsay." *United States v. Holguin*, 51 F.4th 841, 862 (9th Cir. 2022) (quoting *United States v. Vera*, 770 F.3d 1232, 1242 (9th Cir. 2014)).

*Vera* offers a thorough explanation of why and when expert testimony that relies on hearsay may be of concern:

> The Second Circuit's opinion in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), illustrates how case agent expert testimony can violate a defendant's Confrontation Clause rights. The defendants in *Mejia* were members of the MS–13 gang who were being tried for racketeering and related charges. *See id*. at 183. An agent qualified as a gang expert, *see id*. at 193–94, identified custodial interrogations of MS–13 members as at least a partial basis for his testimony "that MS13 taxed non-member drug dealers," "that MS–13 treasury funds were used to purchase narcotics and that MS–13 members used interstate telephone calls to coordinate activities." *Id*. at 199. This testimony was directly relevant to several material issues in the case, including whether MS13 was an enterprise, had an effect on interstate or foreign commerce or engaged in narcotics trafficking. *See id*. at 200.
>
> The agent's testimony violated the Confrontation Clause, however, because he presented testimonial hearsay "in the guise of an expert opinion," *id*. at 199 (quoting *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007)), rather than presenting the information to explain a bona fide expert opinion. The *Mejia* court was "at a loss in understanding how [the agent] might have 'applied his expertise' to these statements before conveying them to the jury." *Id*. Most problematically, the agent's drug tax testimony "was based directly on statements made by an MS–13 member in custody (during the course of this very investigation)." *Id*. (emphasis omitted). To form his drug tax opinion, therefore, the agent did not have to conduct a "synthesis of various source materials" or apply any of "his extensive experience [or] a reliable methodology." *Id*. at 197 [ ]. Instead, the agent "communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion." *Id*. at 198 [ ]. The agent's direct repetition of testimonial hearsay about the drug tax "impugn[ed] the legitimacy of all of his testimony," leading the court to suspect he had merely summarized an investigation conducted by others, rather than applying his expertise to draw his own conclusions. *Id*. at 199.

9

1

> The court therefore held that the agent's "reliance on and repetition
> of out-of-court testimonial statements made by individuals during the
> course of custodial interrogations violated [the defendants'] rights
> under the Confrontation Clause of the Sixth Amendment." *Id*.

2

3

4    *Vera*, 770 F.3d at 1238 (citations truncated).

5         In *Vera*, a detective, Franks, who served both as a gang expert witness and as a percipient

6    witness, testified that the Bishop Manor neighborhood fell within the territory of the Minnie

7    Street Lopers gang; and that the gang controlled the narcotics sales within that neighborhood and

8    the surrounding areas by requiring any non-member drug dealers in the area to pay a tax. 770

9    F.3d at 1238. Because Franks knew from reviewing intercepted telephone calls that one

10   individual, Salvador, did not pay taxes to anyone else in the neighborhood, Franks concluded

11   Salvador was "one of the leaders of the narcotics trade in Bishop Manor." *Id*. Franks also testified

12   about a recorded phone call between Salvador and another individual that was played for the jury,

13   opining that a rival gang was trying to tax Salvador because they believed his friend was selling

14   drugs within their territory. *Id*. at 1238-39. Based on his understanding that the leader of one

15   neighborhood gang is generally the person who pays taxes to the higher-ranking gang in another

16   area, Franks opined that Salvador was "[m]ore than likely the leader" of the Minnie Street Lopers

17   in Bishop Manor. *Id*. at 1239.

18        The defendants in *Vera* argued that Franks impermissibly acted as a conduit for hearsay

19   evidence because he directly "imparted important testimonial facts gleaned from his exposure to

20   gang members and affiliates" without applying any independent judgment. *Id*. The Ninth Circuit

21   disagreed because the detective "applied his experience to his observations to form expert

22   opinions about the Minnie Street Lopers and their tactics." *Id*. The panel's explanation is

23   informative:

> Franks testified he had extensive training about and experience with
> gangs, including some formal classroom training, his time on the
> Santa Ana Gang Task Force and his work at the Santa Ana Police
> Department as a gang homicide investigator and gang suppression
> detective. He was familiar with the Minnie Street Lopers gang in
> particular from his contacts with members when he worked as a
> deputy sheriff in the jail, when he patrolled the area and when he
> transferred to the gang unit of the Santa Ana Police Department.
> Unlike the gang expert in *Mejia*, nothing in Franks' testimony

24

25

26

27

28

10

suggests that he was directly repeating what someone else told him about the Minnie Street Lopers during this or any other investigation. Rather, his testimony that gangs "control the narcotics trafficking in an area" by maintaining control "of selling drugs to buyers" and "of the money," and by requiring "other drug dealers in that area that are not part of that gang" to "pay what's called a tax to that gang," distilled and synthesized what he had learned through his experience. *See Mejia*, 545 F.3d at 197 (implying that the "synthesis of various source materials" constitutes permissible expert testimony).

More importantly, Franks did not impart this information for its own sake, but to explain the basis for his expert opinion that Salvador was "one of the leaders of the narcotics trade in Bishop Manor." He testified that he formed this opinion by reviewing the wiretapped telephone calls, learning that Salvador did not pay taxes to anybody in the neighborhood and applying his knowledge and experience of gang practices to deduce the significance of that information. He further applied this expertise to explain the meaning of a recorded phone call between Salvador and a friend, Walter, that was played for the jury. According to Franks, Walter told Salvador in the call that members of a rival gang believed Walter was "slinging for Salvador" within their territory and were looking for Salvador to verify that he had paid the required tax. Based on his knowledge that the leader of a neighborhood gang is generally responsible for paying taxes to a higher-ranking gang, Franks testified that the phone call further supported his opinion that Salvador was in charge of narcotics trafficking in Bishop Manor.

Franks' expert opinion therefore was not merely repackaged testimonial hearsay but was "an original product" that could have been "tested through cross-examination," [*United States v. Gomez*, 725 F.3d [1121,] at 1129 [(9th Cir. 2013)] [ ], although the defendants declined to do so. Because Franks "appl[ied] his training and experience to the sources before him and reach[ed] an independent judgment," his testimony complied with Crawford and the Confrontation Clause. *Id.* [ ]

*Vera*, 770 F.3d at 1238-40. Therefore, in the context of expert witness testimony, the Confrontation Clause is not implicated when an agent applies his training and experience to sources before him to reach an independent judgment and only imparts hearsay information to explain the basis for his expert opinion. *Vera*, 770 F.3d at 1239-40.

Another concern is that a dual capacity witness will offer his opinions without satisfying either Rule 701 *or* 702. In the context of an overview witness, "[d]elineating the boundaries … becomes even more complicated when the 'overview' witness is also qualified as an expert." *Flores-De-Jesus*, 569 F.3d at 20. For this reason, Rule 701(c) requires that a lay opinion "be the product of reasoning processes familiar to the average person in everyday life." *See Garcia*, 413

11

F.3d at 215 ("explaining that "the purpose of this final foundation requirement is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony" under Rule 702). In considering this, courts "must focus on the reasoning process by which a witness reached his proffered opinion." *Id.* If it rests "in any way" on his specialized knowledge, Rule 702 must govern. *Id.* On the other hand, "as with any other witness, courts cannot allow an overview witness to testify as an 'expert' as to matters that are not appropriately the subject of expert testimony." *Flores-De-Jesus*, 569 F.3d at 20; *see also United States v. Casas*, 356 F.3d 104, 120 (1st Cir. 2004) (agent's testimony "that particular persons were members of the conspiracy was not an appropriate subject for expert testimony" because it "was not in any way linked to the 'specialized knowledge' that Rule 702 requires"); *Dukagjini*, 326 F.3d at 54 ("expert testimony should be excluded if the witness is not actually applying expert methodology").

Of course, even if it is admissible, exclusion may be warranted under Rule 403. For example, there is a "heightened possibility" of undue prejudice that is "especially acute where the dual roles of expert and fact witness are filled by a law enforcement official, in part because 'the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial.'" *Flores-De-Jesus*, 569 F.3d at 21. And whether labeled as an expert or not, a summary witness who is presented "with an aura of expertise and authority" based on a discussion of his background and experience, may increase the risk that jurors would be "swayed" by his testimony rather than rely on their own interpretations. *Grinage*, 390 F.3d at 751. Improper summary testimony may also be cumulative and a "waste of time." *Dukagjini*, 326 F.3d at 54 (citing Fed. R. Evid. 403.)

The unmerited credibility issue may also present itself where a juror, although not inclined to such influence, may be—understandably—confused:

> Straying from the scope of expertise may also implicate another concern under Rule 403, juror confusion. Some jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case. When the witness is a case agent who testifies about the facts of the case and states that he is basing his expert conclusions on his knowledge of the case, a juror

> understandably will find it difficult to navigate the tangled thicket of expert and factual testimony from the single witness, thus impairing the juror's ability to evaluate credibility.

*Dukagjini*, 326 F.3d at 56 (internal citation omitted); *see also Haines*, 803 F.3d at 732 (government's questioning of a dual capacity agent, Lockhart, which failed to distinguish between Lockhart's fact testimony based on personal knowledge and his opinion testimony based on experience, "left the jury to wonder who was testifying, Lockhart-the-expert or Lockhart-the-case-agent") (alterations omitted).

In sum, it is well-established that the line between lay and expert opinion is significantly blurred when offered by the same witness. "Despite these dangers, dual-role testimony is not 'categorically prohibited.'" *Holguin*, 51 F.4th at 862 (quoting *Freeman*, 498 F.3d at 904). In addition to limiting instructions, "[t]he dangers of dual-role testimony can also be mitigated by separating testimony into lay and expert phases, requiring specific foundation testimony, and preventing witnesses from engaging in speculation, conveying hearsay, or interpreting clear statements." *Holguin*, 51 F.4th at 862 (citing *Torralba-Mendia,* 784 F.3d at 658).

Therefore, the Government **SHALL** take steps prevent the jury from being presented with testimony that blurs the distinction between that of an expert and that of a percipient witness. This is best accomplished by articulating the line between lay and expert testimony for the jury *before* they hear it. *See Freeman*, 498 F.3d at 904 ("If jurors are aware of the witness's dual roles, the risk of error in these types of trials is reduced."). Accordingly, the Government **SHALL** give advance notice to the Court and opposing counsel, outside the presence of the jury, if it anticipates that a proffered expert will offer lay opinions or that a lay witness will offer opinions that are properly the subject of expert testimony, to ensure a proper foundation is laid and prejudice is mitigated.[4] Thus, the motion (Doc. 1458), joined in by Messrs. Stinson and Bannick (Docs. 1465, 1488), is **DENIED**.

### 4.   Motion to Exclude Overview and Summary Testimony (Doc. 1456)

Messrs. Clement and Johnson seek notice and exclusion of any overview or summary

---

[4] Likewise, if any Defendant seeks lay and expert opinions from a single witness, that party **SHALL** comply to the same extent as the Government.

1    witness testimony the Government seeks to elicit or summary charts it intends to display at trial.

2    (Doc. 1456 at 2.) Messrs. Stinson and Bannick join in the motion (Docs. 1465, 1488), and the

3    Government opposes it. (Doc. 1543.)

4         "The main difference between summary and overview testimony is that summary

5    testimony comes at the end of trial and overview at the beginning, but both try to connect the dots

6    and convey the big picture to the jury in complex prosecutions." *United States v. Lacerda*, 958

7    F.3d 196, 207 (3d Cir. 2020).

8                        *a.      Overview testimony*

9         Defendants cite *United States v. Garcia*, 413 F.3d 201, 214 (2d Cir. 2005), for the general

10   proposition that the Government should not be permitted to call an "overview witness" at the

11   beginning of trial to summarize the Government's anticipated evidence. (*See* Doc. 1456.) It is true

12   that permitting a witness to summarize the Government's entire case before any evidence has

13   been introduced is "generally viewed as improper." *Garcia*, 413 F.3d at 214. However, as the

14   Government accurately contends, overview testimony may be permitted "to describe the course of

15   the investigation, how it began, the individuals involved, investigative techniques used, and other

16   matters that are within the agent's knowledge and his role in the investigation." (*See* Doc. 1543 at

17   3.) In any case, the Court finds it important to discuss this type of testimony and its risks. In

18   *United States v. Brooks*, the Tenth Circuit explained:

19                Overview testimony is a broader category of evidence, usually
                 offered at the beginning of trial by a government agent as a way to
20               preview the government's case, and can include lay and expert
                 opinion. It occurs when a "witness is put on the stand to testify
21               before there has been any evidence admitted for the witness to summarize."
                 *United States v. Griffin,* 324 F.3d 330, 349 (5th Cir.2003). The
22               testimony provides "an overview of the government's case, setting
                 forth for the jury the script of the testimony and evidence the jury
23               could expect the government to present in its case-in-chief." *United
                 States v. Moore,* 651 F.3d 30, 54-55 (D.C. Cir. 2011).
24               …

25               But overview testimony is susceptible to abuse. It can stray into
                 matters that are reserved for the jury, such as opinions about a
26               defendant's guilt or a witness's credibility. An overview witness, for
                 example, might express opinions about the defendant's truthfulness
27               at certain times or his likelihood of being involved in a scheme or
                 crime, thus usurping the jury's role in making fact findings based on
28               the credibility and demeanor of witnesses with personal knowledge.

                                         14

1

> Other potential problems include the government's ability (1) to spin
> the evidence in its favor before it is admitted (assuming it is ever
> admitted), (2) to give its official imprimatur to certain evidence, and
> (3) to allow its witnesses (usually law enforcement) to testify on
> matters about which they have no personal knowledge or that are
> based on hearsay. *See Moore,* 651 F.3d at 56.

2

3

4

5   736 F.3d 921, 930 (10th Cir. 2013). In *United States v. Flores-De-Jesus*, 569 F.3d 8 (1st Cir.

6   2009), rejected this type of testimony, finding "no justification for presenting an overview witness

7   who simply anticipates the testimony of other government witnesses, even if he does so

8   accurately," because such testimony "is not simply a repetition (at best) of other evidence. It is

9   also, in effect, an endorsement of the veracity of the testimony that will follow." *Id.* at 18-19. As

10  *Brooks* noted, other circuits agree. *See United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003)

11  ("unequivocally condemn[ing] th[e] practice as a tool employed by the government to paint a

12  picture of guilt before the evidence has been introduced"); *United States v. Moore*, 651 F.3d 30,

13  60-61 (D.C. Cir. 2011), *aff'd sub nom. Smith v. United States*, 568 U.S. 106 (2013) (joining the

14  First, Second, and Fifth Circuits in condemning the use of witnesses to present an overview of

15  government's case-in-chief).

16        As these cases recognize, however there is a narrow purpose for which this testimony is

17  permissible. "Courts generally allow overview testimony to the extent it concerns how an

18  investigation began, the law enforcement agencies involved, or the investigative techniques

19  used." *Brooks*, 736 F.3d at 930 (citing *Moore*, 651 F.3d at 61; *Flores–de–Jesus,* 569 F.3d at 19

20  (noting that overview testimony should be limited to "constructing the sequence of events in the

21  investigation"); *Griffin,* 324 F.3d at 349 (approving of testimony to "describe a complicated

22  government program")). Thus, with a limiting jury instruction, the Government may call an

23  officer "who is familiar with an investigation or was personally involved" to "tell the story of that

24  investigation." *Lacerda*, 958 F.3d at 208. Once a proper foundation has been laid, he may also

25  "offer lay opinion testimony and testify about matters within his personal knowledge," but like

26  every other witness, he may not "opine on the ultimate issues of guilt, anticipate evidence that the

27  government hoped to introduce, or express an opinion about the strength of that evidence or the

28  credibility of any potential witnesses." *Id.; see also Garcia*, 413 F.3d at 213 (overview law

15

enforcement witness may not, under Rule 701, express lay opinions as to a defendants' culpability based on "all the evidence gleaned by various agents in the course of the investigation and not limiting himself to his own personal perceptions"). Accordingly, Defendants' motion (Doc. 1456), and the joinders thereto (Docs. 1465, 1488) are **DENIED** as to overview witness testimony. The Government **SHALL** provide notice to the Court and the defense of any proposed overview testimony it intends to elicit at the outset of trial as soon as practicable, but no later than **12:00 p.m. on Monday, January 13, 2025**, to ensure Defendants have an opportunity to respond without delaying the trial proceedings.

### b.    *Summary testimony and charts*

"Although conceptually similar to overview testimony … summary testimony comes toward the end of a case and is used to repackage complex testimony or already [] admitted evidence for the jury." *Brooks*, 736 F.3d at 931. Such testimony must be "completely consistent" with the other evidence introduced at trial. *Flores-De-Jesus*, 569 F.3d at 18.

Defendants assert that whether offered by a lay person or an expert, summary testimony or exhibits "conveying information gleaned by statements of others" would violate the Confrontation Clause and the Government should not be permitted to "circumvent" those rights by calling an expert to provide "so-called 'summary' testimony about factual situations." (Doc. 1456 at 4.) They challenge admission of such evidence under Federal Rules of Evidence 602, 702, 703, and the Sixth Amendment. (*Id.*) In opposition, the Government contends it should be permitted to call a summary witness at the end of its case-in-chief "to help the jury organize and evaluate evidence over the course of a long trial, and testify to lay opinions based on the witness's first-hand knowledge and personal investigation." (Doc. 1543 at 3.)

Courts have recognized both the value and danger in admitting summary testimony. On one hand, it may "help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses." *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989). On the other, it creates a risk that "the credibility of summary witnesses will be substituted for the credibility of the evidence actually summarized."

16

1   *United States v. Wong*, 2014 WL 923347, at \*9 (N.D. Cal. Mar. 5, 2014), *aff'd*, 603 F. App'x 639

2   (9th Cir. 2015); *see also United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) ("there

3   would be no need for the trial jury to review personally any evidence at all" if "jurors could be

4   'helped' by a summary witness for the Government, who could not only tell them what was in the

5   evidence but tell them what inferences to draw from it"); *United States v. Lemire*, 720 F.2d 1327,

6   1348 (D.C. Cir. 1983) (highlighting the risk "that the jury will treat the summary as additional

7   evidence or as corroborative of the truth of the underlying testimony").

8          On balance, the Ninth Circuit has held that the use of non-expert summary testimony, as

9   well as accompanying charts, is permitted by Federal Rule of Evidence 611(a), which authorizes

10  courts to "exercise reasonable control over the mode of presenting evidence so as to (1) make

11  these procedures effective for determining the truth, and (2) avoid wasting time." *United States v.*

12  *Baker*, 10 F.3d 1374, 1412 (9th Cir. 1993), (cleaned up); *United States v. Gardner*, 611 F.2d 770,

13  776 (9th Cir. 1980) (finding it was within court's discretion under Rule 611(a) to permit use of

14  chart in court that "contributed to the clarity of the presentation to the jury, avoided needless

15  consumption of time and was a reasonable method of presenting the evidence"); *United States v.*

16  *Singh*, 2017 WL 4700042, at \*3 (E.D. Cal. Oct. 19, 2017), *aff'd sub nom. United States v.*

17  *Sharma*, 851 F. App'x 708 (9th Cir. 2021) ("The law is clear that summary witnesses are

18  permissible."). Summary testimony also comports with Rule 602. *See Lemire*, 720 F.2d at 1347

19  (concluding that where the witness only summarized evidence already offered by prior witnesses

20  by testifying from his personal knowledge of the transcripts and exhibits, rather than testifying

21  about any events underlying the trial, his testimony was permitted by Rule 602).

22         In *United States v. Ray*, 370 F.3d 1039 (10th Cir. 2004), *vacated on other grounds*, 543

23  U.S. 1109 (2005), the Tenth Circuit provided two factors for district courts to consider when

24  exercising discretion under Rule 611(a). First, courts look to "whether the summary chart or

25  testimony aids the jury in ascertaining the truth," by accounting for "the length of the trial, the

26  complexity of the case, and the accompanying confusion that a large number of witnesses and

27  exhibits may generate for the jury." *Id.* at 1046-47 (quoting *United States v. Johnson*, 54 F.3d

28  1150, 1159 (4th Cir. 1995)). It then considers "the possible prejudice that may result to the

defendant in allowing such evidence, looking specifically to whether the preparer of the chart was available for cross-examination and whether the district court gave appropriate limiting instructions." *Id.* at 1047.

The Government contends that the RICO conspiracy charged in this case is "factually complex" and will be revealed in the fragmented testimony of approximately 80 witnesses and hundreds of exhibits, including "documents, photos, physical items, and wiretap calls" over the course of several months. (Doc. 1543 at 3.) Given the anticipated length, volume, and complexity of this trial, it is nearly certain that summary testimony would be helpful to the jury in understanding the evidence. If it is permitted, the Court will take steps to minimize the prejudicial risks by allowing the defense to cross-examine the preparer of any summary charts and any summary witness through voir dire examination. *See Lemire*, 720 F.2d at 1348. It will also give limiting instructions admonishing the jury not to consider the summary or charts as evidence, only as an aid in evaluating it. *See Does I-XIX v. Boy Scouts of Am.,* 2019 WL 2448318, at *2 (D. Idaho June 11, 2019) (instructing jury that the witness was not testifying as an expert, his testimony was not evidence, and the jurors would be the final judges of what the documents testified to meant, and excluding evidence of the witness's career, qualifications, and personal background).

The Government also asserts that should it choose to call a summary witness at the end of its case, that witness may also offer lay opinions "based on his first-hand knowledge and personal investigation." (Doc. 1543 at 3.) Defendants' motion does not seek to exclude lay opinion testimony or otherwise raise a challenge to its general admissibility under Rule 701. Even so, the Court stresses it will not allow a summary witness to offer an "additional closing argument" for the Government "that comes from the witness stand." *Lemire*, 720 F.2d at 1349; *see also United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006) ("Rule 701 forbids the admission of expert testimony dressed in lay witness clothing.").

The Court cannot yet determine the prejudicial or cumulative effect of permitting summary testimony, charts, or opinions. Such a determination is best made after the

1  Government's witnesses have testified and the Court considers whether, and to what extent, the

2  jury would benefit from it. *Lemire*, 720 F.2d at 1350. Therefore, the Court **RESERVES** ruling on

3  the motion as to summary testimony, charts, and opinions until the appropriate time at trial. The

4  Government **SHALL** provide proper notice prior to presentation of such evidence such that

5  Defendants are afforded a reasonable opportunity to respond and so as not to delay the trial

6  proceedings.

7          5.     Motion to Exclude Testimony Regarding Cellebrite Extractions and

8          Historical Cell Site Information (Doc. 1460)

9        Messrs. Clement and Johnson seek to exclude any testimony "regarding cellphone

10  extractions produced by the Cellebrite UFED tool and any expert testimony regarding historical

11  cell site information." (Doc. 1460 at 1.) They argue exclusion is required under Rules 702 and

12  403 "because the methodology is unreliable, irrelevant, and its probative value is substantially

13  outweighed by the danger of unfair prejudice." (*Id*. at 2.) They also request a *Daubert* hearing.

14  (*Id.*) Messrs. Stinson and Bannick join in the motion. (Docs. 1465, 1488.) The Government

15  opposes it. (Doc. 1548.)

16              *a.*    *Cellebrite extraction reports*

17        Defendants take issue with two expert witnesses identified in the Government's

18  preliminary expert notice with respect to the extractions: Detective Mike Rivas (listed as

19  "Forensic Analyst") from the Los Angeles County Sheriff's Office, and Special Agent Benjamin

20  Mendoza (listed as "Forensic Analyst") from CDCR.[5]  (*See* Doc. 1548 at 2; Doc. 1452-1 at 5-6.)

21        Defendants claim these witnesses "will testify to device extraction and analysis using

22  Cellebrite and other data analytic tools." (Doc. 1460 at 5.) However, they argue the Government

23  has not identified an expert who will "explain how the system functions and establish the

24  reliability of the underlying technology" and that "[t]estimony by someone who plugged a phone

25  into a device and pushed the start button does not explain what the device is *doing*, what its *error*

26

27  [5] The defense also lists Jerry Wong, another forensic analyst, who will testify to Cellebrite extraction. The Government confirmed in its opposition and at the motions in limine hearing that it does not intend to call this witness. Similarly, Defendants' motion does not name Mr. Mendoza. Counsel for Defendants confirmed at the hearing that its challenge as to Mr. Rivas applies equally to Mr. Mendoza.

28

1   *rate is*, and whether the results can meet the *Daubert* standard for *reliability*." (*Id.* at 6, emphasis

2   in original.)

3       The Government explains that while both agents qualify as experts in the use of

4   Cellebrite, they were only disclosed "to fully cover potential testimony" regarding Cellebrite

5   extractions and will only be called to testify as fact witnesses at trial. (Doc. 1548 at 2.) According

6   to the Government, its presentation of evidence will include "brief" testimony from Messrs. Rivas

7   and Mendoza regarding exhibits generated from a Cellebrite cell phone extraction they personally

8   performed. (*Id.*)

9       The Government specifies that each agent's testimony will be limited to explaining: (1)

10  "the basic foundational steps he took to use the Cellebrite [sic] by following basic software

11  prompts to obtain data from the phone;" (2) "that, during the extraction process, he could not

12  manipulate, alter, or modify phone data through Cellebrite;" and (3) that "[o]nce the extraction

13  was complete, he used Cellebrite to generate a report." (Doc. 1548 at 3.) The Government intends

14  to then introduce "a few pages" from that report into evidence. (*Id.*) It contends this testimony

15  does not involve the type of specialized knowledge that Rule 702 demands. (*Id.* at 2.) The agents

16  "will not opine about the reliability or any other aspect of the Cellebrite technology." (Doc. 1548

17  at 3.)

18      The government observes that in *United States v. Williams*, the Fifth Circuit held that

19  "[w]hen law enforcement uses Cellebrite to pull information from a phone and a lay juror would

20  require no additional interpretation to understand that information, the party does not need to

21  introduce the evidence through an expert." 83 F.4th 994, 995 (5th Cir. 2023). In reaching this

22  conclusion, the court recognized that "[e]very circuit that has addressed this question—whether

23  evidence obtained with Cellebrite technology requires expert testimony for admission—has

24  answered it in the negative." *Id.* at 997 (citing *United States v. Chavez-Lopez*, 767 F. App'x 431,

25  434 (4th Cir. 2019); *United States v. Marsh*, 568 F. App'x 15, 17 (2d Cir. 2014)). Of particular

26  note, *Williams* recognized that the Ninth Circuit "reached the same result" in *United States v.

27  Ovies*, 783 F. App'x 704 (9th Cir. 2019), where the Court "found that the witness's testimony was

28  not based on technical or specialized knowledge, as he 'testified only about the steps he took

1   using the Cellebrite program' and 'did not opine as to the reliability' of Cellebrite." *Williams,* 83

2   F.4th at 997 (quoting *Ovies*, 783 F. App'x at 707).

3   Other decisions within the Ninth Circuit have admitted similar testimony. *See, e.g., United*

4   *States v. McLeod*, 755 F. App'x 670 (9th Cir. 2019) (finding no abuse of discretion by district

5   court for admitting testimony without making a reliability finding under Rule 702, where the

6   witness testified about what Cellebrite does, how he used it to extract information from a cell

7   phone, and how he could select what data to extract); *United States v. Seugasala*, 702 F. App'x

8   572, 575 (9th Cir. 2017) (unpublished) ("The officers who followed the software prompts from

9   Cellebrite and XRY to obtain data from electronic devices did not present testimony that was

10  based on technical or specialized knowledge that would require expert testimony."). The Court

11  finds these cases instructive.

12  The Court is aware—as are counsel—that the Cellebrite tool is one that is widely used and

13  is one of only a small handful of such applications that are generally accepted in the law

14  enforcement field as the method by which data may be extracted from electronic devices. The

15  information Cellebrite produces is understandable to jurors and the lay witnesses who will testify

16  will base their testimony on personal knowledge from the output. Fed. R. Evid. 602, 701.

17  Provided the agents testify within these bounds, Rule 702 does not apply. As to this testimony,

18  the motion (Doc. 1460) and joinders thereto (Docs. 1465, 1488), are **DENIED**.

19  *b.   Historical cell site data*

20  Messrs. Clement and Johnson also seek exclusion of expert testimony and evidence

21  pertaining to historical cell site data. (Doc. 1460.) On this subject, the Government intends to

22  proffer the expert testimony of Danielle Ponce de Leon, a crime analyst for the Los Angeles

23  Sheriff's Office. (*See* Doc. 1452-1 at 8.)

24  *i.   Legal standards*

25  "Faced with a proffer of expert scientific testimony . . . the trial judge must determine at

26  the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will

27  assist the trier of fact to understand or determine a fact in issue. This entails a preliminary

28  assessment of whether the reasoning or methodology underlying the testimony is scientifically

1    valid and of whether that reasoning or methodology properly can be applied to the facts in issue."

2    *Daubert*, 509 U.S. at 592. The Supreme Court has provided a non-exclusive list of factors that

3    weigh into a trial court's reliability determination, including: (i) whether the method has been

4    tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate;

5    (iv) the existence of standards and whether the witness applied them in the present case; and (v)

6    whether the witness's method is generally accepted as reliable in the relevant medical and

7    scientific community. *Daubert*, 509 U.S. at 593–94.

8         Before admitting expert testimony into evidence, the district court must perform its

9    gatekeeping role by making an explicit finding of reliability. *United States v. Ruvalcaba-Garcia*,

10    923 F.3d 1183, 1188-90 (9th Cir. 2019) (internal quotation marks and citation omitted). In so

11    doing, the Court must find both that (1) the witness is qualified in the tendered area(s), and (2)

12    that, based on the methodologies employed, the witness has a "reliable basis in the knowledge

13    and experience of the relevant discipline" to offer opinions in the tendered area(s). *Id*. at 1190.

14            *ii.*    *Qualifications and relevance*

15         As an initial matter, Defendants do not dispute Ms. Ponce de Leon's qualifications or that

16    her testimony is relevant within the meaning of Rule 702.[6] (*See* Doc. 1460.) In her 14 years of

17    being a crime analyst, she has worked on hundreds of homicide investigations, through, *inter alia*,

18    cell tower and toll analysis.[7] Some of her duties have included "identifying phone numbers

---

19

20    [6] Defendants repeatedly refer to relevance and helpfulness, but their entire analysis pertains to reliability concerns. The Court can discern no legal argument addressing relevance. (*See* Doc. 1460 at 7-15.)

21    [7] The Seventh Circuit helped define "historical cell site analysis" in *United States v. Hill*, 818 F.3d 289 (7th Cir. 2016):

22        Historical cell-site analysis uses cell phone records and cell tower locations to determine, within some range of error, a cell phone's location at a particular time. A cell phone is essentially a two-way radio that uses a cellular network to communicate. Aaron Blank, *The Limitations and*

23    *Admissibility of Using Historical Cellular Site Data to Track the Location of A Cellular Phone*, 18 Rich. J.L. & Tech. 3, 5 (2011). Each cell tower covers a certain geographic area. That geographic area depends upon "the number of antennas operating on the cell site, the height of the antennas,

24    topography of the surrounding land, and obstructions (both natural and manmade)." *Id*. In urban areas, cell towers may be located every one-half to one mile, while cell sites in rural areas may be

25    three to five miles apart. *Id*. When a cell phone user makes a call, the phone generally "connect[s] to the cell site with the strongest signal," although "adjoining cell [towers] provide some overlap in

26    coverage." *Id*. While the proximity of the user is a significant factor in determining the cell tower with which the cell phone connects, it is not the only one. *Id*. Other factors include the towers'

27    technical aspects, including geography and topography, the angle, number, and directions of the antennas on the sites, the technical characteristics of the relevant phone, and "environmental and

28    geographical factors." *Id*. at 7.

associated to targets and suspects; obtaining, interpreting, and managing call detail records, cell

tower information, historic specialized location data, and billing records; cellular telephone tower

triangulation, and 'real time' and historical GPS data to locate a suspect, witness, victim or

evidence; use of specialized software available to law enforcement to acquire and process this

information, including creation of charts, tables, and maps based on the data acquired." (Doc.

1452-1 at 8.)  Therefore, the Court find Ms. Ponce de Leon is qualified in historical cell site data

analysis.

Her proffered testimony is relevant. According to the Government's expert disclosure,

Ms. Ponce de Leon intends to testify as follows:

> Ms. Ponce de Leon will testify as to her reports and exhibits generated regarding
> the cellular site analysis related to the mobile telephones of individuals associated
> with the double homicide in Lomita on or about October 3 and 4, 2020, charged in
> Counts Two and Three of the Third Superseding Indictment. At trial, Ms. Ponce de
> Leon's testimony will include information identifying the users/subscribers to
> those telephones, as well as the locations and movements of those telephones at
> times relevant to this case. Ms. Ponce de Leon's opinions will be based on the
> information she gathered to create those reports, including call logs, call data, cell
> cite data, including times and places of calls or other communications to/from the
> devices identified, and other data provided to investigators, either by the cellular
> telephone providers supporting the telephones in question, or data taken directly
> from the telephones themselves.

(Doc. 1452-1 at 8.) She will also testify to call detail records, subscriber information, social media

research analysis, cell tower and toll analysis, and "analysis of movements" of cell phones related

to the Pomona murders, as well as her use of "geofence" data and other data used to create maps

of movements of those cell phones. (*Id.* at 8-9.) Ms. Ponce de Leon's testimony is expected to

provide the jury with sufficient information such that they could "reasonably and reliably infer,"

based on their own consideration of that testimony, where a defendant or phone associated with

him was located at a particular time. This will help the jury to understand the cell data analysis

reports and to determine a fact in issue.

### iii.    Reliability

"Historical cell-site analysis can show with sufficient reliability that a phone was in a

general area, especially in a well-populated one. It shows the cell sites with which the person's

---

*Hill*, 818 F.3d at 295-96.

cell phone connected, and the science is well understood." *United States v. Hill*, 818 F.3d 289,

298 (7th Cir. 2016) (citing *United States v. Evans*, 892 F. Supp. 2d 949, 956 (N.D. Ill. 2012)).

Thus, Defendants' critique of cell site data for its lack of precision is not well taken. As the *Hill*

court clarified:

> Our concern is that the jury may overestimate the quality of the
> information provided by this analysis. We therefore caution the
> government not to present historical cell-site evidence without
> clearly indicating the level of precision—or imprecision—with
> which that particular evidence pinpoints a person's location at a
> given time. The admission of historical cell-site evidence that
> overpromises on the technique's precision—or fails to account
> adequately for its potential flaws—may well be an abuse of
> discretion.

818 F.3d at 299. Indeed, the Government notes that "[c]ourts have consistently found that

historical cell site evidence is admissible as long as the evidence is offered to establish a general

location." (Doc. 1548 at 8, collecting cases.)

Defendants point out that '[t]opography, geography, weather, population density, and cell

tower outages often impact signal strength," but this very argument was rejected by a court in this

District. *See United States v. Howard*, 2017 WL 2662469, at *3 (C.D. Cal. June 19, 2017) ("[T]he

mere existence of factors affecting cell signal strength that the expert may not have taken into

account goes to the weight of the expert's testimony and is properly the subject of cross-

examination, but does not render the fundamental methodology of cell site analysis unreliable.")

(quoting *United States v. Jones*, 918 F. Supp. 2d 1, 5 (D.D.C. 2013)). To the contrary, "cell site

data analysis is a widely used and respected methodology that has overwhelmingly been found

admissible by federal courts." *Id.* Defendants conclude that "[a]t best, historical cell site analysis

can sometimes show that an individual is within one to five kilometers of a cell tower." (Doc.

1460 at 12.) They do not point out, however, the authority that has held that this doesn't bear on

the 702 analysis. What matters is whether the expert indicated the level of precision with which

the evidence places someone or something at a given time. *Hill*, 818 F.3d at 299. To be sure, the

Government gives the following assurances:

> Ms. Ponce de Leon will testify to the extent of the reach of historical
> cell site data, in that historical cell site data analysis is based on the
> premise that the approximate (not exact) location of a cell phone can

be determined by examining the records generated by the cell phone when it was used. Through her training and experience and expertise, she will explain what these records contain, what happens when a cell phone communicates with a cell tower, and how she analyses the records provided by cell phone companies that contain historical cell site data. She will be able to explain to the jury that all of the service providers maintain a "tower list", archived periodically throughout the year, which provide the exact location of towers within their network, and which contains additional information that is used to determine orientation of the tower series. [¶] Ms. Ponce de Leon will be able to explain to the jury what is needed to conduct an analysis of this type of data, and how she is able to map the data once it is analyzed. She will explain how results are compiled and conclusions are drawn and how she compiles those results for use by investigators or at trial. Her testimony will indicate that the maps show the general area where a phone was located at a certain date and time, and how these locations can be refined, but that they are not exact locations. Her expert opinion, based upon training and experience, will identify why the data she analyses is reliable in showing the general location of the phone in question.

(*Id.* at 11.)

Finally, the Government represents that there is "independent confirmation of the events external" to this data at issue to corroborate the reliability of Ms. Ponce de Leon's testimony. It estates that "[w]itnesses will testify to the movement of defendants to which the cell site data is attributed, including one of the individuals for whom a cell phone was tracked during charged offenses using the cell site data in question. Additionally, independent evidence, such as license plate readers and surveillance cameras overlap the general location of the cellphones analyzed using historical cell site data." (Doc. 1548 at 11.)

The Court "has discretion to decide how to test an expert's reliability[,] as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ((quotation marks and footnote omitted); *see also Howard*, 2017 WL 2662469, at *2 ("'[T]he test of reliability is flexible,' and *Daubert*'s list of factors to consider, such as whether the method can or has been tested or is subject to peer review, 'neither necessarily nor exclusively applies to all experts or in every case.'") (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). Accordingly, the Court finds that in this case, the methods employed by Ms. Ponce de Leon are reliable. On this ground, the motion (Doc. 1460) and joinders thereto (Docs. 1465, 1488), are **DENIED**.

25

6.      Motion to Preclude or Limit Testimony of Gang Expert Steven Slimp

(Docs. 1452, 1459)

Messrs. Clement and Johnson move to preclude the Government's proposed gang expert, Sergeant Steven Slimp, from testifying at trial. (Doc. 1459.) Messrs. Bannick and Stinson join. (Docs. 1465, 1488.) Mr. Bannick also filed a motion seeking exclusion or limitation of Slimp's testimony. (Doc. 1452.) Defendants argue that Slimp's proposed testimony is irrelevant and unreliable under Rule 702, and that it will violate the Sixth Amendment's Confrontation Clause. (*See* Doc. 1452 at 10-19; Doc. 1459 at 4-8.) They also seek exclusion based on Rule 403. (Doc. 1452 at 21; Doc. 1459 at 12.) Alternatively, Defendants argue that the scope of Slimp's testimony should be limited; Mr. Bannick further requests a *Daubert* hearing, at which he argues Slimp "should be required to testify concerning each actual opinion the government seeks to offer, and the bases and reasons for each of his proffered opinions so that the Court can assess the reliability of each and determine which, if any, would assist the trier of fact" under Rule 702. (Doc. 1452 at 23.) The Government filed a consolidated opposition to the motions. (Doc. 1551.)

*a.      Qualifications and relevance*

Sergeant Steven Slimp is a gang expert employed by the CDCR in its Special Service Unit for Gang Intelligence Operations. (Doc. 1551 at 3.) He has extensive training and experience in corrections and prison gang investigations, with "particular focus" on the Aryan Brotherhood. (*Id.* at 3-4.) The Government's expert disclosure letter indicates that Slimp will provide testimony about the AB and, more specifically, will testify to the following topics and opinions:

- The AB's history and roots in the California prison system;
- The AB's membership, structure, codes of conduct, symbols, tattoos, purposes, and slang;
- How the AB enforces its rules, code of conduct, and promotes discipline among the enterprise;
- The AB's control/subordination of white inmates and other disruptive groups;
- The AB's rival gangs and their membership process, structure, symbols, and codes of conduct;
- How the enterprise includes associates, who are people closely affiliated with the AB; and
- The meaning of coded language and/or slang used by AB members.

(*Id.* at 4.) The Government's disclosure letter contains specific details about Slimp's

26

qualifications and the bases for his opinions:

> His testimony will be based on more than 16 years working in California prisons, including many years working as a gang expert within the CDCR's Gang Intelligence Operations unit. He has received formal training in gang structure and organization, including specific training about the structure and organization of the AB. His testimony will also be based on conducting interviews of dozens of AB gang members and associates, facilitators, and allies, including debriefing AB gang members and associates. In addition, Sgt. Slimp bases his opinions about the AB upon his observations made throughout his extensive career within the various assignments detailed in his *curriculum vitae*. Moreover, he has taught over thirty classes for law enforcement about the AB across the western United States. That training includes providing over 100 hours of training to law enforcement officials about gangs. Sgt. Slimp has not authored any published articles. In sum, Sgt. Slimp's training and experience demonstrates that he has devoted years to working with AB gang members and associates, investigating AB gang members and associates, and crimes committed by or on behalf of the AB. This experience provided him the opportunity to hear the admissions of the specific gang members and associates involved in the criminal affairs of the AB, and to communicate and work with hundreds of other gang members, including members and associates of the AB.

(*See* Doc. 1551-1 at 4-5.)

To qualify as an expert under Rule 702, a witness's "knowledge, skill, experience, training, or education … need only exceed the common knowledge of the average layman," a liberal standard. *Holguin*, 51 F.4th at 854 (cleaned up). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). The Court is "not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id*. at 969-70; *see also* Fed. R. Evid. 702(a) (expert testimony is admissible if it will "help the trier of fact to understand the evidence or to determine a fact in issue").

The Court has considered the Government's disclosure letter and Sergeant Slimp's *curriculum vitae*, which details his various investigative roles within the California prison system and special assignments with numerous statewide law enforcement agencies over the course of his 16-year career. (*See* Doc. 1551-1 at 5.) Slimp started his career as a correctional officer in 2008 and began working as an investigator in 2010. In 2015, Slimp accepted a position in the

Security Threat Group Unit, focusing on investigation gang member and associate illegal activities. He was later assigned to the Fresno Gang Taskforce, where he was further exposed to, and documented, the criminal activities and "inner workings" of various gang members. He accepted his current position in the Gang Intelligence Operations Unit in 2017, and in this role, specializes in monitoring the AB's influence over CDCR and the community at large. Slimp has "interviewed dozens of AB member, associates, facilitators, and allies of the AB to corroborate, learn, understand, and monitor the AB's violent and criminal influence over CDCR and in the community." (*Id.*) He is also "directly involved in multiple on-going investigations into the criminal activities of the AB" in six counties, spanning from Sacramento to San Diego. Slimp has received formal training in gang structure and organization, including specific training about the structure and organization of the AB. He has taught over 30 classes about the AB, including over 100 hours of training about gangs.

Based on Sergeant Slimp's extensive experience, the Court finds Slimp is qualified to testify as an expert. *Holguin*, 51 F.4th at 854 ("Law enforcement professionals are routinely qualified to offer expert testimony based on their training and experience."). The Court also finds that the Government has demonstrated that Slimp has relevant and helpful expertise based on his extensive training and experience as a prison gang investigator specializing in the AB. He has more than 16 years of experience working in the California prison system, more than 14 years of experience as an investigator of major crimes, including violent and narcotic-related crimes, within the CDCR, and more than 9 years of experience investigating prison gang activity. (*See* Doc. 1551-1 at 5.) This is sufficient to establish that his specialized knowledge would be helpful to the trier of fact in understanding on the topics outlined in his disclosure. Fed. R. Evid. 702(a); *see Holguin*, 51 F.4th 841, 856 (9th Cir. 2022) (10 years of investigative experience); *United States v. Alatorre*, 222 F.3d 1098, 1104 (9th Cir. 2000) (12 years of experience as special agent); *United States v. Yandell*, Case No. 2:19-CR-00107-KJM, ECF 1923 (AB expert with 14 years of gang investigation experience).

> ### b.   Reliability

Whether an expert's testimony is reliable is "an inquiry that focuses not on 'what the

experts say,' or their qualifications, 'but what basis they have for saying it.'" *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)). "A law enforcement expert can reliably testify about the structure and activities of criminal organizations based solely on experience." *Id.* at 856. Officers also "may testify about their interpretations of commonly used drug [or gang] jargon based solely on their training and experience." *Id.* (internal quotation marks omitted).

Cory Perryman, the government's expert in *Yandell*, was similarly qualified to Slimp. Perryman was also an experienced agent in the Gang Intelligence Operations unit who testified as a "CDCR gang expert." *Yandell*, Case No. 2:19-CR-00107-KJM, ECF 1923. The government in *Yandell* planned to ask Perryman to offer expert opinion about the AB's "history, its membership, structure, codes of conduct, symbols, purposes, and slang." This is nearly identical to the topics Sergeant Slimp will testify to, and for this reason the Court finds *Yandell* particularly helpful. Addressing these generalized topics on which Perryman intended to testify, the court explained:

> Many of Perryman's opinions will simply "educate the factfinder on general principles," Fed. R. Evid. 702, advisory committee notes to 2000 amendments, such as the Aryan Brotherhood's structure and goals, *see* Suppl. Perryman Not. at 1–2. Offering expert opinions about general principles is a "venerable practice" that the Rules of Evidence have long permitted. Fed. R. Evid. 702, advisory committee notes to 2000 amendments. Because Perryman is qualified, and because his opinions likely will be helpful to explain to the finder of fact "a secretive group of people with a day-to-day life foreign to those on the outside," Mot. Exclude at 3, the government need only show his general-principles opinions are "reliable" and "fit the facts of the case," Fed. R. Evid. 702, advisory committee notes to 2000 amendments (quotation marks omitted).

> Some of Perryman's opinions also will be more specific to this case: he likely will explain what specific words or phrases mean, and he likely will testify that in his opinion, defendants Yandell, Sylvester and Troxell are in fact members of the Aryan Brotherhood. *See* 22 Suppl. Perryman Not. at 3. Although his testimony will be based on his personal experience and not some systematic or scientific methodology, that does not make his opinions or his methods unreliable. *See Kumho Tire*, 526 U.S. at 150.

*Yandell*, Case No. 2:19-CR-00107-KJM, ECF 1923.

Slimp's opinions, at least insofar as they are set out in his expert report, are similarly general. His CV and the Government's expert notice highlight Slimp's extensive background in

the prison context and significant exposure to the inner workings of gangs, mostly the AB. He has taken his years of knowledge and shared it ten-fold with his peers. He therefore "distilled and synthesized" his knowledge through experience. *United States v. Vera*, 770 F.3d 1232, 1239 (9th Cir. 2014). He has "obtained a significant amount of knowledge regarding the AB including their methods of operation, criminal activities, gang terminology, trends, rivalries, alliances, tattoos, and symbols commonly utilized by the AB" (Doc. 1452-1 at 11) and "distilled and synthesized" his knowledge, relying on his "more than 16 years working in California prisons," including many years working as a gang expert. *United States v. Vera*, 770 F.3d 1232, 1239 (9th Cir. 2014). His opinions will be based upon his observations made over the course of his extensive career through various assignments as well as "conducting interviews of dozens of AB gang members and associates, facilitators, and allies, including debriefing AB gang members and associates." Thus, as the Ninth Circuit explained in *Holguin*, Slimp has used "his own experience as an investigator, including what he learned from these sources, to form conclusions about how [the Aryan Brotherhood] operates." *Id.* "The same experience [would allow him] to testify reliably about gang terminology familiar from investigations." *Id.* The Court agrees. It appears that Mr. Slimp's experience provides a reliable basis for his opinions.

> c.    Objections

Defendant's challenge the relevance of Slimp's testimony, relying on various cases for the general proposition that when an expert strays from testifying based on his purported expertise to merely summarizing the facts, he is no longer assisting the jury to understand the evidence, but rather serving to bolster other witness's credibility and serving as a conduit to hearsay. (*See* Doc. 1459 at 5-8.)[8] These appear to be essentially the same arguments raised and addressed with

---

[8] To the extent Messrs. Clement and Johnson raise this challenge in anticipation that Slimp will provide lay opinions as an expert or otherwise will be called as dual-role, overview, or summary witness, such an objection is improper. As the Court has discussed, although it is common for the government to use law enforcement officers as dual-role witnesses, *United States v. Holguin*, 51 F.4th 841, 851 (9th Cir. 2022), such a practice is not "categorically prohibited," *id.* at 862 (quoting *Freeman*, 498 F.3d at 904). The Government has represented that it does not intend to call any dual-role witnesses and the Court has ordered it to give proper notice if the circumstances change at trial. (Doc. 1547 at 3.) While the Court appreciates that this issue may arise regardless of whether Slimp is called to testify as a lay witness, the Court will not preemptively exclude it on speculation. Moreover, the Government states that "lay witnesses who express an opinion would be doing so under those parameters, and not as an expert witness,

respect to summary, overview, and dual role testimony. The Court refers the parties to those sections. These objections are overruled. There is no indication that Mr. Slimp will offer percipient testimony but, instead, will testify about the purposes, structure, etc., of the Aryan Brotherhood, which is evidence that would be helpful to the jury in resolving key questions in this case.

At the hearing, the defense also sought all documents upon which Mr. Slimp relied in forming his opinions, to include every autobiography of every gang drop-out, with which Mr. Slimp is familiar. First, the government has produced whatever documents upon which Mr. Slimp will rely, though it appears to the Court that his opinions will stem from his practical experience over the course of his career. Second, the request of the defense is little more than a fishing expedition that has no connection to what is required by an expert.[9] As to the one redacted autobiography that was produced—unrelated to Mr. Slimp—the Court will address that below. Otherwise, the motions (Docs. 1452, 1459) are **DENIED**.

### 7.   Motion to Exclude Defense Experts (Docs. 1448, 1558)

The Government moves to exclude the testimony of all five expert witnesses Messrs. Clement and Johnson intend to call at trial: Dr. Jeffrey Neuschatz, Robert Ayers, Brian Chase, Angela Malley, and Natasha Powers-Marakis. (Docs. 1448, 1558; *see also* Doc. 1443.) Mr. Johnson, joined by Mr. Clement, filed oppositions to the motions. (Docs. 1561, 1579, 1611, 1615.) Mr. Bannick joins in opposition concerning the testimony of Mr. Ayers and Dr. Neuschatz. (Doc. 1587.) The Government filed a reply brief (Doc. 1596), which was not permitted by the Court's scheduling order, and will not be considered. (*See* Doc. 1286 at 3.)

#### a.   Dr. Neuschatz and Robert Ayers

According to Defendants' expert notice, Dr. Neuschatz is a psychologist who will provide testimony concerning cooperating witnesses generally, as well as the Government's cooperating witnesses in this case. (Doc. 1443 at 2.) The notice states:

---

unless designated as such, and after a proper foundation for the opinion has been established." (*Id.*)

[9] As the Court observed at the hearing, a doctor need not produce every patient file for every patient they treated over their career to offer expert testify grown out of that doctor's experience. The same is true as to Mr. Slimp.

> [Dr. Neuschatz] has studied and conducted research on the prototypical cooperating witness/informant, the persuasive power of confession evidence, and false informant testimony. His research has found that it is difficult to determine the veracity of cooperating witness statements, and their confession evidence has the potential to taint remaining evidence. Dr. Nueschatz [sic] will testify to these subjects generally and that based on his research, studies and expertise and review of relevant discovery in this case, the government's cooperating witnesses are prototypical cooperating witnesses.

(*Id.*)

Mr. Ayers is a "corrections expert" with 50 years of experience in corrections and 35 years of active service, having held positions ranging from line level correctional officer to Warden. (*See* Doc. 1448-1 at 2-3.) During his time with CDCR, Mr. Ayers "conducted, supervised, and/or managed hundreds of investigations which involved the use of confidential information and confidential informants." (*Id.* at 3.) He was also "a member of or chaired thousands of classification committee hearings during which confidential information was reviewed with regard to inmates' housing, program, and security status." (*Id.*) Mr. Ayers' expert report sets forth the opinions he intends to offer at trial. He states,

> I will testify regarding the use of confidential information and confidential informants. Specifically, I will testify about methods used to obtain confidential information and the need to corroborate confidential information before taking action(s) for or against individuals and/or groups. I will testify that it has been my experience that individuals and/or groups may provide confidential information as a self-serving means of manipulating decision making by staff. This could come in the form of Inmate #1, being in debt to Inmate #2, provides confidential information – true or not -- of a nature that might prompt staff to lock up Inmate #2 in Administrative Segregation thus possibly freeing Inmate #1 from repaying the debt. I will testify that confidential information should not be the sole source of decision making by staff and requires a corroborative process to make good faith effort in avoiding mere rumors, hearsay, or 3rd/4th hand information as a sole means of decision making.

(*Id.*)

The Government argues this testimony should be excluded because "(1) it would usurp the jury's role of evaluating witness credibility, (2) it would not be helpful because it does not address an issue that is beyond the common knowledge of the average layperson, and (3) it would be misleading and present a risk of unfair prejudice." (Doc. 1448 at 3.) In opposition, Defendants

1    contend the experts will assist the jury by providing "critical context and information outside the

2    knowledge of lay jurors regarding informant testimony." (Doc. 1561 at 1, 4.)

3                        *i.*        *Opinions on witness credibility*

4            Defendants indicate that Mr. Ayers and Dr. Neuschatz will provide "context and

5    specialized knowledge concerning informants, why they may lie, and what information the jury

6    should focus on in determining if any particular informant might be fabricating their testimony."

7    (Doc. 1561 at 5.) However, it is not the expert's role to advise the jury how to "properly" weigh

8    informant testimony, or any testimony, for weighing the credibility of witnesses is reserved to the

9    jury themselves. *See United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985) (stating that

10   witness credibility is a matter for the jury and expert testimony on the subject invades the

11   province of the jury); *see also United States v. Ramirez-Rodriquez*, 552 F.2d 883, 884 (9th Cir.

12   1977) ("[I]t is the exclusive function of the jury to weigh the credibility of witnesses, resolve

13   evidentiary conflicts and draw reasonable inferences from proven facts."); *Nimely v. City of New*

14   *York*, 414 F.3d 381, 398 (2d Cir. 2005) ("[T]his court, echoed by our sister circuits, has

15   consistently held that expert opinions that constitute evaluations of witness credibility … are

16   inadmissible under Rule 702.").

17           Indeed, the Ninth Circuit Model Instructions emphasize to jurors that it is their role to

18   weigh the evidence, which includes the sworn testimony of any witness. *See* 9th Cir. Manual of

19   Model Crim. Jury Instr. 1.1 ("When you deliberate, it will be your duty to weigh and to evaluate

20   all the evidence received in the case and, in that process, to decide the facts."); Instr. 1.3 ("[t]he

21   evidence you are to consider in deciding what the facts are consists of … the sworn testimony of

22   any witness"); Instr. 1.5 ("It is for you to decide how much weight to give to any evidence.");

23   Instr. 1.7 ("In deciding the facts in this case, you may have to decide which testimony to believe

24   and which testimony not to believe. You may believe everything a witness says, or part of it, or

25   none of it."); *see also* Instr. 6.1; Instr. 6.8. The instructions inform the jury of the factors to

26   consider when deciding how much weight to give witness testimony, *see* Instr. 1.7, Instr. 1.4; *See*

27   Doc. 1616 at 12; Doc. 1624-1 at 20-22; Doc. 1557 at 11-12.

28           Not only is it widely understood that weighing credibility is for the jury alone the mere

                                                    33

1    fact that the jury is charged with such a duty demonstrates that Mr. Ayers'[10] and Mr. Neuschatz's

2    testimony would not be helpful. "[D]etermining the credibility of a witness is squarely within the

3    common knowledge of the average layperson because 'the jury is the lie detector in the

4    courtroom.'" *United States v. Chavez*, 2021 WL 5810298, at *1 (N.D. Cal. Dec. 7, 2021) (quoting

5    *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973)). If such help from an expert was

6    needed, the jury would be left to sit back and let the professionals tell them what their verdict

7    should be. *See Barnard*, 490 F.2d at 912 (expert testimony about the veracity of a witness "may

8    cause juries to surrender their own common sense in weighing testimony").

9                                    *ii.    Mr. Johnson's objections*

10         Mr. Johnson suggests that the testimony will not invade the province of the jury because

11   neither Mr. Ayers nor Dr. Neuschatz will opine that "most" informant witnesses are incentivized

12   to lie or that any *particular* testifying informant should not be believed; instead, it will provide

13   the math to prove it. (*See* Doc. 1561 at 4.) This argument misses the mark. Such opinions are not

14   required for an expert witness to usurp the jury's role. It is enough that the proffered testimony

15   seeks to supplant the thought process of the jury. Mr. Johnson contends the testimony will "help"

16   the jury weigh the evidence in a manner deemed "proper" by Defendants—by finding informant

17   testimony unpersuasive. In other words, the proffered testimony serves one purpose: to tell the

18   jury how they should weigh the witnesses' credibility.

19         In addition, this argument directly contradicts Defendants' indication that Dr. Neuschatz

20   will testify about his research on the "prototypical" untruthful cooperating witness followed by

21   his opinion that *the Government's cooperating witnesses* qualify as prototypical cooperating

22   witnesses. (Doc. 1443 at 2; Doc. 1561 at 4.) Thus, to the extent that Mr. Ayers or Dr. Neuschatz

23   will opine directly on the Government's cooperating witnesses' truthfulness, this testimony would

24   also violate Rule 702(a).

25         Mr. Johnson's assertion that the testimony is not within the common knowledge of an

26   _____

27   [10] At the hearing, Mr. Johnson's counsel seemed to assert that Mr. Ayers would testify about the debriefing process
     used when people drop out of gangs. The Court is aware that the government has produced the autobiography of such
     a person—*See infra*—but there is no suggestion that Mr. Ayers has any opinions about this debrief. Indeed, the
28   showing by Mr. Johnson fails to explain in any fashion how Mr. Ayer's testimony would bear on any issue other than
     the one discussed here—how the jurors would the testimony of informants.

1    average layperson is similarly misplaced. (Doc. 1561 at 6.) In so arguing, he takes the position

2    that the testimony involves "prison culture," and Mr. Neuschatz's knowledge is specific to the

3    prison context, which is "far afield from the average layperson's experience." (*Id.*) Simply

4    because the average layperson has never heard of "fundamental attribution error" does not mean

5    that they must be so enlightened. This witness credibility expertise has no bearing on

6    understanding the evidence within the meaning of Rule 702; only how to weigh it.

7          Finally, the Government collects several cases where the court refused Dr. Neuschatz's

8    proposed testimony on this topic. (Doc. 1448, citing *Chavez*, 2021 WL 5810298; *United States v.*

9    *Benedict*, 2013 WL 6500120, at *3 (D. Minn. Dec. 11, 2013); *United States v. Benedict*, 855 F.3d

10   880, 885 (8th Cir. 2017); *United States v. DeLeon*, 2021 WL 4909981, at *1 (D.N.M. Oct. 21,

11   2021); *United States v. Rhodes*, 2022 WL 2764198, at *4 (D. Or. July 15, 2022); *United States v.*

12   *Withrow*, 4:22-CR-109, Order, docket no. 120 (July 3, 2023).) These cases substantiate the

13   Court's reasoning. Therefore, the Government's motion (Doc. 1448) is **GRANTED**.

14                        *b.     Brian Chase*

15         According to Messrs. Clement and Johnson's expert disclosure, Brian Chase is a computer

16   and cell phone forensic expert who obtained and preserved data from a social media account

17   associated with a witness in this case. (Doc. 1443 at 2.) The Government moves to exclude Mr.

18   Chase's testimony, which it anticipates will concern "how he obtained and preserved the data,

19   and which social media account it came from." It also anticipates Mr. Chase will testify to

20   methods of viewing and preserving posts on social media, an issue that is not beyond the

21   understanding of a normal juror. (Doc. 1558 at 6.) It also contends that it would be improper to

22   admit the posts from that account through Mr. Chase, as they contain inadmissible hearsay. (*Id*.)

23   Mr. Johnson clarifies in his opposition that Mr. Chase is being called to authenticate the posts that

24   he forensically extracted and preserved, not to testify to the contents of those posts. (Doc. 1611 at

25   2.) Because Mr. Chase will not testify to its contents and the document itself is not being

26   introduced or admitted through Mr. Chase, any hearsay objections are misplaced. Thus, the

27   motion is **DENIED**.

28   ///

*c.*     *Angela Malley*

Angela Malley is a forensic video expert for the defense who will testify to the examination of a video received from a witness in this case. (Doc. 1443 at 3-4.) The Government objects to the introduction of the video through Ms. Malley as it does not lay a proper foundation for the video and "the viewing of a video does not go beyond the understanding or ability of a normal juror." (Doc. 1558 at 6.) Mr. Johnson clarifies that Ms. Malley will testify "to a recording obtained from a witness which she forensically examined to determine if the video had been altered or tampered with. She is not being called to admit the video or testify to its contents. The witness who made the video will be called for that purpose." (Doc. 1611 at 2.) Therefore, the motion to exclude this testimony is **DENIED as moot**.

*d.*     *Natasha Powers-Marakis*

Natasha Powers-Marakis is a retired police sergeant and crime scene expert who will provide opinion testimony concerning the crime scene investigation of the Lomita and Pomona homicides at issue in this case. (Doc. 1443 at 3.) Defendants' supplemental expert notice indicates that Ms. Powers-Marakis will offer the following opinions:

- That the overall investigation into this case was not done according to best practices, including California POST ICI training.
- That failing to locate and interview witnesses in the area of the murder was not best practice and demonstrates the failure to conduct a thorough, adequate and complete investigation.
- That failing to obtain original evidence is never best practice and can only lead to an erroneous conclusion rather than a conclusion based upon all of the best possible evidence.
- That failing to collect evidence immediately and within a reasonable time frame after the crime was discovered leads to the loss of evidence that, in this case, was never recovered.
- That failure to preserve and collect evidence properly leads to a biased investigation and eventual conclusion about the crime that occurred and those responsible for the crime.
- That information obtained from witnesses and or informants should be validated through other aspects of the investigation. Failure to do so can and often does lead to an erroneous conclusion.

(Doc. 1504.) Defendants indicate that Ms. Powers-Marakis' opinions are based on "review of the limited discovery the government produced" and will also be based on the investigators' testimony at trial. (Doc. 1443 at 3.)

36

Furthermore, Ms. Powers-Marakis' *curriculum vitae* reveals that prior to retiring, she was employed by the Palo Alto Police Department, where she served in both patrol and investigative capacities for 14 years. (Doc. 1504-1 at 1.) She also served as a police academy instructor and fulfilled duties in policy writing and review as well as management and training in force operations. (*Id.*) She currently operates a consulting and investigation business. (*Id.*) Her areas of expertise include, *inter alia*, police investigations; police procedure, practices, and tactics; police training; police evidence collection and handling; and police response to critical incidents. (*Id.* at 1-2.) Ms. Powers-Marakis graduated from the police academy in 1997; she holds a Bachelor of Arts degree in Political Science from San Jose State University, a Master of Science degree in Emergency Management from California State University, Long Beach, and is a graduate of Boston University's paralegal program. (*Id.* at 5.) Her "partial list" of certificates and training spans pages. (*See id.* at 5-7.) In the last four years, she has been deposed as an expert witness at least 12 time and testified as an expert witness at trial at least 6 times. (*Id.* at 8-9.)

Importantly, the Government does not challenge Ms. Powers-Marakis' qualifications to testify as an expert or that she has employed a reliable methodology in reaching the conclusions she intends to offer at trial. The Court finds that Ms. Powers-Marakis' credentials that she is qualified in crime scene investigation and that she employed reliable methods from that discipline to offer opinions in the areas mentioned above. Instead, the Government challenges the relevance of her testimony. The Government argues that Ms. Powers-Marakis' opinions are not beyond the understanding of a normal juror and therefore, they do not aid the trier of fact. (Doc. 1558 at 6.).

The Government claims that "failings in the investigation can be elicited during cross-examination of the actual investigators, and any opinion of such testimony is not beyond the understanding of a normal juror." (Doc. 1558 at 6.) But Ms. Powers-Marakis is not offering an opinion of the investigators' testimony. As the Court understands the expert notice, she intends to form her opinion based on the application of her knowledge, training, and experience to the facts testified to by the investigators and the discovery she reviewed in the case. Moreover, the Government fails to support its argument that a "normal" juror is sufficiently familiar with, for example, evidence preservation, law enforcement strategy, or POST ICI training protocol, such

1    that Ms. Powers-Marakis' wealth of knowledge would not help him.

2          Mr. Johnson likens Ms. Powers-Marakis' testimony to that permitted in *United States v.*

3    *Wells*, 2019 WL 3229912, at *14 (D. Alaska July 17, 2019), which the Court finds illustrative:

> [A]pplying these standards the district court permitted a defense expert to testify regarding "whether the homicide investigation met professional standards or was otherwise impaired, in support of the defense theory that law enforcement incorrectly focused on [the defendant] as a suspect." This included having the expert testify concerning "(1) explaining proper and necessary law enforcement protocols and procedures in a murder investigation; (2) identifying mistakes and 'common subtle traps and hazards' that affect a murder investigation; and (3) discussing 'cognitive biases, probability errors and organization traps to assist [the jury] in evaluating the large volume of evidence presented about the massive investigation that took place in this case.'" *Id.* at 13.

11   (Doc. 1611 at 4.)

12         The Government also asserts that Ms. Powers-Marakis' opinion is "generalized and not

13   based upon actual knowledge of or participation in the investigations in this case and merely

14   relies upon reports produced in discovery." (Doc. 1558 at 6.) The Government does not explain

15   how this fits into the Rule 702 analysis. As an expert, Ms. Powers-Marakis must have *specialized*

16   knowledge, not *personal* knowledge. Under Federal Rule of Evidence 703, "[t]he facts or data

17   upon which expert opinion is based may be derived from three possible sources: (1) the firsthand

18   observation of the witness with opinions based thereon traditionally allowed; (2) presentation at

19   trial[ ]; and (3) presentation of data to the expert outside of court and other than his own

20   perception." *Feindt v. United States*, 2024 WL 1717371, at *2 (D. Haw. Apr. 22, 2024) (citing

21   Fed. R. Evid. 703, advisory committee's notes to 1972 proposed rules) (internal quotation marks

22   omitted). Thus, the Court finds Ms. Powers-Marakis' testimony would be helpful to the trier of

23   fact under Rule 702. The Government's motion is **DENIED**.

24         **C.     Government's Motions in Limine (Docs. 1446-1447)**

25                1.     Motion to Conditionally Admit Co-Conspirator Statements (Doc. 1446)

26         The Government seeks to conditionally admit "numerous" co-conspirator statements it

27   intends to introduce at trial before the foundational elements of conspiracy are established. (Doc.

28   1446 at 1.) The Government intends to introduce these co-conspirator statements through "many"

                                              38

witnesses, including "several cooperating witnesses who had communications with the defendants and their co-conspirators concerning murder, extortion, robbery, drug trafficking, fraud, and other conduct undertaken on behalf of and in furtherance of the Aryan Brotherhood enterprise." (*Id*.) The statements include "wiretap calls between members of the Aryan Brotherhood and Aryan Brotherhood associates, and conversations between Aryan Brotherhood members and associates, including conversations occurring in person, over telephone, and through text and other electronic means." (*Id*. at 2.)

The Government argues that the numerous co-conspirator statements may be admissible at trial but that holding a hearing prior to the admission of each statement would create a substantial burden on the Court and the parties. (Doc. 146 at 2.) Thus, the Government contends the Court should conditionally admit the statements and should Defendants wish to have any statements stricken, they should move to do so before the Government concludes its case. (*Id*.) Messrs. Johnson and Clement each filed an opposition to the Government's motion. (Docs. 1542, 1564.) Mr. Bannick joins in both oppositions (Doc. 1587) and Mr. Clement joins in Mr. Johnson's opposition. (Doc. 1577.) Mr. Perkins, who has since been severed from this trial, also filed an opposition (Doc. 1566), which the Court has considered because it was joined by Messrs. Clement and Bannick. (Docs. 1580, 1587.)

In addressing this motion, the Court finds helpful the concise summary of the relevant standards provided in *United States v. Yandell*, No. 2:19-CR-00107-KJM, 2023 WL 2071282 (E.D. Cal. Feb. 16, 2023):

> The Federal Rules of Evidence make exceptions to the ordinary rule against hearsay for a co-conspirator's out-of-court statements. A statement by a member of a conspiracy is not hearsay if the defendant was a member of the same conspiracy, if the statement was made during the conspiracy and if it was made in furtherance of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E); *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Admissibility under this exception is a preliminary and procedural question, not one of guilt or liability, so in a criminal case it is for the court to decide, not the jury. *See Bourjaily*, 483 U.S. at 175. The standard of proof is a preponderance of the evidence. *Id*. at 175–76.
>
> The three-part test for admissibility under Rule 801(d)(2)(E) can make the government's evidentiary burden somewhat circular in a conspiracy prosecution: the government might attempt to prove the

39

conspiracy using evidence that itself requires proof of a conspiracy. This raises several logistical questions. If the government would like to admit the statement of an alleged co-conspirator, should the court require the government to prove first that the defendant was part of the alleged conspiracy? If so, when must it offer that proof, and in what setting? By pretrial motion? In an evidentiary hearing? At trial? Or should the court instead permit the government to introduce the statements during trial on the condition that proof be introduced later, as the Federal Rules expressly permit in questions of relevance? *See* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.").

Rule 801(d)(2) does not outline a procedure. Nor do the Federal Rules of Criminal Procedure. The Ninth Circuit and Supreme Court have not imposed specific requirements either. The Ninth Circuit has instead left the decision to a district court's discretion in recognition of "the need for flexibility and judgment" about "the particular nature of each case." *United States v. Kenny*, 645 F.2d 1323, 1334 (9th Cir. 1981). The Federal Rules of Evidence also speak generally about a district court's discretion to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence." Fed. R. Evid. 611(a). The goal is an "effective" procedure that avoids "wasting time" and "protect[s] witnesses from harassment or undue embarrassment." *Id.*

Although the Ninth Circuit has not imposed a procedure, it has approved of one: a co-conspirator's out-of-court statements "may be admitted provisionally subject to later motions to strike." *United States v. Batimana*, 623 F.2d 1366, 1369 (9th Cir. 1980); *see also, e.g.,* Kenny, 645 F.2d at 1333–34. One advantage of this approach is its potential efficiency. It allows the government to present all of its evidence only once, and it allows the court to have all of that evidence when it decides whether to admit the disputed statements. One disadvantage of this procedure is its obvious risks. If the government does not ultimately prove the underlying conspiracy as alleged, then it may have disclosed inadmissible hearsay to the jury. It may be difficult or even impossible to separate admissible from inadmissible evidence after the fact, which could lead to a mistrial. *See Kenny*, 645 F.2d at 1333–34.

Alternatively, a district court could require the government to prove the conspiracy first. The first part of the trial, for example, could be dedicated to proving the conspiracy. Justice Robert Jackson once advocated this procedure in a concurring opinion. *Krulewich v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring). A front-loaded procedure could even begin before trial with an evidentiary hearing before the court only.

In the late 1970s, the Fifth Circuit described this frontloaded procedure as the "preferred order of proof." *United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979) (*en banc*). More recently, however, appellate courts have expressed reservations. *See, e.g., United States v. Andrus*, 775 F.2d 825, 837 (7th Cir. 1985); *Kenny*, 645 F.2d at

40

1333–34. A fully frontloaded procedure prevents mistrials, but at a high price. As the Ninth Circuit wrote in *Kenny*, this price is highest in complex cases with many alleged conspirators. "The District Court would face numerous difficult rulings based on nice distinctions between evidence going to the existence of the conspiracy and evidence of a defendant's acts in perpetration of the conspiracy." 645 F.3d at 1333. When one of the alleged conspirators testifies for the government, "such distinctions would become nearly impossible to draw." *Id*.

Some courts have sought a middle ground. The Seventh Circuit, for example, has advised district courts to "require the government to preview the evidence which it believes brings the statements within the co-conspirator rule." *United States v. Schoffner*, 826 F.2d 619, 630 (7th Cir. 1987). This "preview" might be as simple as a pretrial proffer to give the district court some comfort a mistrial is unlikely if it permits the government to introduce a co-conspirator's statements conditionally. *See, e.g., United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991) (outlining possible procedures). Other courts have addressed the admissibility decision at the pretrial stage but have scrapped the pretrial hearing. The United States District Court for the Northern District of California, for example, has made a preview procedure part of its local rules for criminal cases. It requires the government to disclose a "summary" of any statements it intends to offer under the hearsay exception. N.D. Cal. Crim. L.R. 16-1(c)(4). The summary must include "sufficient detail that the Court may rule on the admissibility of the statement." *Id*.

*Yandell*, 2023 WL 2071282, at *2–3. The Government appears to request conditional admission without being required to make any proffer or pre-introduction showing. (*See* Doc. 1446 at 4 ("Requiring the government, at this stage, to identify all the coconspirator statements it intends to introduce at trial, as well as the various bases for their introduction, would be unwieldy, counterproductive, and contrary to the prevailing law and practice in most circuits, much less the Ninth Circuit.").)

In their oppositions, Defendants uniformly objected to this approach because the Government had not yet specifically identified which statements it intended to introduce conditionally. (*See* Doc. 1564 at 1 ("The government essentially argues that it would be a burden on this court to assess the statements prior to trial because there are too many of them. But that is the point."); Doc. 1542 at 2 (complaining that discovery produced "1000s of hearsay statements" and that it was unclear "what statements [would be] admitted? Who made them? Which witnesses will testify to the statement? For which conspiracy?"); Doc. 1566 (complaining that based on the discovery alone, the defense "does not know the identity of all the people the government alleges

1  are co-conspirators" and "does not know which of the otherwise hearsay statements within [the

2  discovery] materials the government intends to introduce at trial.").) Defendants also expressed

3  concern that the Government's motion defines the conspiracy too broadly as follows:

> [T]he proof at trial will show that the defendants engaged in a
> conspiracy with codefendants and unindicted coconspirators to
> commit multiple acts involving murder, extortion, robbery, drug
> trafficking, and fraud, as alleged in the indictment. The
> statements made by coconspirators and the defendants contain statements made
> about the ongoing activities of the Aryan Brotherhood enterprise, and
> are not limited to statements about the commission of crimes, but
> include statements made about the enterprise itself, indicating
> enterprise structure, membership and the activities of various AB
> members and associates, rules and codes of conduct, including the
> way the AB influences criminal street gangs, and methods and means
> used by the Aryan Brotherhood to effectuate AB rules, criminal
> offenses, and discipline.

11  (Doc. 1446 at 4–5.) Mr. Clement, for example, complains that this "defines the conspiracy as the

12  Aryan Brotherhood throughout California and everyone connected to it, including every

13  defendant in this case and many unnamed others over a period of many years" and that "[t]he

14  purposes of the proposed conspiracy similarly are generic and not time-bound." (Doc. 1564 at 3.)

15  This hyperbolic language does not advance the issue.

16       A few days after the oppositions were due, Magistrate Judge Oberto required the

17  Government, by December 27, 2024, to provide defense counsel the Bates stamp numbers of each

18  "Statement the Government intends to offer under Fed. R. Evid. 801(d)(2)(E)" that was

19  previously produced to Defendants pursuant to paragraph 6 of the Scheduling Order. (Doc. 1585

20  at 2–3.) Theoretically, this disclosure should have given Defendants a more refined understanding

21  of the scope and source of the co-conspirator statements the Government intends to offer, which

22  should also have helped clarify the timeline of the alleged conspiracy. However, at oral argument,

23  the Government indicated that it responded to Judge Oberto's order by designating the ranges of

24  Bates numbers within which co-conspirator statements could be found. The defense asserted that

25  this disclose did little to clarify the situation.

26       Even still, the Court shares the Government's concerns about the logistics of any

27  procedure that would require individualized pre-introduction proffers regarding the admissibility

28  of each co-conspirator statement. *Yandell*, which also concerned VICAR charges against

1    members of the Aryan Brotherhood, again provides some guidance. The evidentiary record in

2    *Yandell* was lengthy, meaning that "making necessary decisions about the length of the alleged

3    conspiracy, its participants and their statements is likely to be difficult if not impossible without a

4    great deal of context." 2023 WL 2071282, at *5. There, in moving for a pretrial procedure to

5    frontload the determine whether co-conspirator statements were admissible, the defense requested

6    that for every statement the Government identify "the declarant, the approximate date of the

7    statement, the statement or a summary of the statement, if appropriate, the pertinent event, the

8    source or witness, and an explanation for the admissibility of each statement under the co-

9    conspirator exception and any additional grounds for admissibility." *Id*. Given the large record in

10   that case, the court concluded that "[m]aking necessary decisions about the length of the alleged

11   conspiracy, its participants and their statements is likely to be difficult if not impossible without a

12   great deal of context" and that "[w]ithout that context, a pretrial procedure focused on co-

13   conspirators' statements is unlikely to be a useful or reliable way to determine whether those

14   statements are admissible." *Id*. Because "[t]he costs of th[e] proposed pretrial procedure,

15   including likely duplication of effort and delays, [were] likely to be high," the court instead opted

16   for conditional admission. *Id*. Among other things, the court noted that the Government had

17   "already disclosed a great deal of evidence and information about the alleged conspiracy,

18   including in the original and superseding indictments, the 143-page criminal complaint and

19   extensive discovery"; had "also obtained the convictions of several alleged co-conspirators by

20   guilty pleas"; and that the "plea agreements include admissions under penalty of perjury that the

21   Government could prove the alleged conspiracy." *Id*. Given "so much evidence of a conspiracy

22   already on the public record and in the defendants' possession, it seem[ed] unlikely the jury will

23   hear evidence that should not have been admitted under the hearsay exception." *Id*.[11]

24   _____

25   [11] Shortly before trial in *Yandell*, the court denied without prejudice the Government's pretrial motion for
     a finding that the conspiracy existed, in part because the pretrial showing did not tie any particular

26   statement to the conspiracy but rather offered broad categories of statements that "might" be admissible.
     *United States v. Yandell*, No. 2:19-cr-00107-KJM, Doc. 1798 at *4 (E.D. Cal. Jan. 11, 2024). The court

27   later granted a similar motion after the Government rested its case in chief. *United States v. Yandell*, 2024
     WL 1660521 (Apr. 17, 2024). Relevant to the present dispute, despite the fact that the Government did not

28   provide detailed pretrial information about the co-conspirator statements it intended to offer, the *Yandell*
     court reiterated its position that provisional admission was the appropriate trial procedure for such a

The same is generally true here. The Government has disclosed voluminous evidence and information about the alleged conspiracy, including the original and several superseding indictments, the 140-page criminal complaint, and extensive discovery. Several guilty pleas have also been accepted, in which the defendants have likewise admitted to the existence of a conspiracy. (*See, e.g*., Docs. 1261, 1276, 1284, 1285.) As in *Yandell*, this lessens the risk of the jury hearing evidence that should not have been admitted under the hearsay exception. *See also United States v. Jesenik*, No. 3:20-CR-228-SI, 2022 WL 11815826, at *18–19 (D. Or. Oct. 20, 2022) (allowing conditional admission of coconspirator statements and denying request for a summary of proposed statements "rooted in the same discovery concerns underlying [a] prior motion to continue" because the defense had access to "significant information about the anticipated testimony of government witnesses").

Notwithstanding its motion for conditional admission, when pressed at oral argument about the fact that the Government still has not have identified with clarity the co-conspirator statements it intends to offer at trial—as oppose to the universe of statements the co-conspirator has made— the Government conceded that it would lay the foundation for such statements by presenting information that would allow the Court and the parties to understand how each statement was connected to the conspiracy. Given this concession, the Court will permit provisional introduction of co-conspirator statements **but will require the Government to provide a summary to the Defense of statements it intends to offer, which come within the co-conspirator hearsay exception, at least two days in advance of the relevant witness.** If there are disputes, the parties **SHALL** meet and confer to attempt to resolve these disputes. If they cannot be resolved, they **SHALL** raise the concerns with the Court outside the presence of the jury and well in advance of the presentation of that testimony. The Government's motion (Doc. 1446) is **GRANTED IN PART**.

### 2.    Motion to Preclude Reference to Predicate Acts (Doc. 1447)

The Government moves in limine for an order prohibiting "any questions, argument, comments, references, or suggestions" related to the predicate acts referenced in Count One of the complex case.

1   indictment for which the Government does not offer proof at trial. (Doc. 1447 at 1.) Mr. Johnson

2   filed an opposition (Doc. 1541), joined in by Messrs. Clement and Bannick. (Docs. 1586, 1587.)

3   Mr. Clement also filed an opposition (Doc. 1565), joined in by Mr. Bannick. (Doc. 1587.)

4       The Government anticipates that arguments will be raised at trial regarding the fact that

5   Defendants were only involved in some of the predicate acts identified in the indictment or that

6   the Government has not proven every predicate act alleged in the indictment. (Doc. 1447 at 2.)

7   The Government contends that allowing defense counsel to make such references despite the fact

8   that the Government will not offer every act as proof in its case-in-chief "would only cause

9   confusion to the jury about the defendants who have been severed from the January trial, the

10  charges the government will thereby not be proving at this trial, and the proof actually required of

11  the government to obtain convictions under Count One." (Doc. 1447 at 3.) The Court agrees.

12      Indeed, twenty predicate acts are alleged in connection with Count One, including acts of

13  seven co-defendants who have either entered guilty pleas or who have been severed from the

14  upcoming trial. (*Id.*; Doc. 1098 at 7-9 ¶ 20.) In support of the RICO count, the Government

15  alleges racketeering activity committed by one or more of the eleven charged defendants over a

16  period of more than seven years. (*Id.* at 7-9.) The activity includes multiple murders, including

17  those set forth in Counts 2, 3, 5 and 6, extortion, robbery, fraud, identity theft, drug trafficking,

18  and arson. (*Id.*)

19      Despite the number of acts alleged in the indictment, the Government need not prove each

20  of them, and it has made clear that it does not intend to do so. *See United States v. Yannotti*, 541

21  F.3d 112, 129 (2d Cir. 2008) ("[T]o prove a defendant's membership in the agreement, the

22  government need not prove that the defendant committed or agreed to commit any of the charged

23  predicate acts as long as the government proves that he participated in some manner in the overall

24  objective of the conspiracy."); *see also Salinas v. United States*, 522 U.S. 52, 64-66 (1997);

25  *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004); *United States v. Nelson*, 2024

26  WL 1659883, at *19 (N.D. Cal. Apr. 17, 2024) ("a defendant does not have to commit a predicate

27  racketeering act himself, but 'just that they know' and 'agree' that other members of the

28  enterprise would").

At the motions in limine hearing, the Government informed the Court that it will not offer proof as to predicate acts that none of the four trial Defendants—that is, Messrs. Clement, Johnson, Stinson, or Bannick—is alleged to have committed. It appears to the Court that this would exclude acts (a), (c), (f)-(i), (k), (m), (n), and (q). (*See* Doc. 1098 at 7-9 ¶ 20.) To preserve the record, the Government **SHALL** file a notice indicating the predicate acts for which it will not offer proof at trial no later than **Friday, January 10, 2025**. To this extent, the motion is **GRANTED in part**.

### D.     Mr. Johnson's Motion to Exclude or Limit Government Exhibits (Doc. 1441)

Mr. Johnson seeks to exclude certain exhibits identified by the Government in its preliminary exhibit list provided to Defendants on November 15, 2024. (Doc. 1441.) Messrs. Clement and Bannick join in the motion. (Docs. 1470, 1488.) According to Mr. Johnson, the exhibit list offered by the Government "identified 333 exhibits, some of which contain 100s or 1000s of pages." (Doc. 1441 at 2.) Mr. Johnson notes two exhibits that he doubts the Government will seek to admit in their entirety, one of which pertains to a cooperating witness's Facebook account comprising 2,123 pages and another which contains call detail records totaling 4,257 pages. (*Id.*) He asks that the Court order the Government "to reduce these exhibits to the number of pages it actually intends to introduce, so that Defendants can lodge more specific objections." (*Id.*)

At the hearing on the motions in limine, counsel for Mr. Johnson represented that the Government had provided the defense with an updated exhibit list since the motion, wherein the Government identified the exhibits by Bates stamp number. As to the particularly voluminous items, the Government provided narrow and specific Bates ranges. Thus, counsel only sought to clarify that the specific ranges fully comprised the portions the Government intended to use at trial. The Government confirmed that the specific Bates ranges represented the portions it would rely on in its case-in-chief, not including impeachment and rebuttal. Therefore, the motion is **DENIED as moot**.

///

///

46

**E.      Mr. Bannick's Motions in Limine (Docs. 1453-1454)**

       1.      Motion to Play Unconscious Bias Video for Prospective Jurors (Doc. 1453)

Mr. Bannick, joined by Messrs. Stinson and Clement, asks that the Court order the Jury Administrator to play an "unconscious bias" video to all prospective jurors. (Docs. 1453, 1465, 1474). Mr. Bannick asserts the video was produced by the U.S. District Court for the Western District of Washington to play for prospective jurors and requests that this Court do the same, in order to "introduce, explain and perhaps provide a greater understanding of its very real impact on the Sixth Amendment right to a jury trial." (Doc. 1453 at 2-3.) He also asks that the Court obtain permission to rebroadcast the video by sending a written request to that court. (*Id.*)

According to Mr. Bannick, the video "provides a well-balanced and professionally produced general introduction and discussion concerning unconscious bias, incorporating all stakeholders' (court, prosecution, and defense) perspectives in various segments." (Doc. 1453 at 3.)  He notes that the video offers examples of images that may trigger unconscious biases in viewers "simply by seeing the image." (*Id.*) Mr. Bannick argues that the video is specifically appropriate in this trial, as he is "a heavily tattooed white male and an alleged member of a white supremacist street gang" and these factors—race, appearance, and gang affiliation—"are exactly the type of factors that can produce reactions rooted in unconscious bias." (*Id.* at 2-3.)

As a matter of practice, the Jury Administration for the Eastern District of California plays a video highlighting unconscious bias and its effect on the trial process as part of its orientation process for prospective jurors, and the Court finds this video is sufficient. This, combined with the Court's jury instructions, will sufficiently emphasize the jury's duty to act fairly and impartially. *See* 9th Cir. Manual of Model Crim. Jury Instr. 1.1 (Duty of Jury); Instr. 1.7 (Credibility of Witnesses); Instr. 6.1 (Duties of Jury to Find Facts and Follow Law); Instr. 6.19 (Duty to Deliberate). Therefore, Mr. Bannick's motion (Doc. 1453) and the joinders thereto (Docs. 1465, 1474) are **DENIED**.

       2.      Motion for Gang Membership Preliminary Jury Instruction (Doc. 1454)

Mr. Bannick requests that "immediately before" the Court informs the jury of the charges and allegations in this case, it gives the instruction that "the Aryan Brotherhood has not been

47

1  outlawed, membership in or association with the Aryan Brotherhood is not illegal, and neither is

2  an element of the crimes charged." (Doc. 1454 at 2.) Mr. Bannick makes this motion in

3  anticipation of the Government's opening statement, which he argues will emphasize the AB and

4  the activity its members are known to engage in, leading to the jury's "erroneous belief that

5  membership in or association with the prison gang is *per se* evidence of the criminal conduct

6  charged." (*Id.*) Absent the requested instruction, Mr. Bannick contends he will be denied a fair

7  trial because upon hearing of his alleged association with the AB, the jury will presume he is

8  guilty. (*Id.*) Messrs. Stinson and Clement join in the motion. (Docs. 1465, 1475.)

9       In response, the Government argues this proposed instruction is "argumentative, misstates

10  the law, and would confuse and mislead the jury; and because [Mr. Bannick's] gang membership

11  is relevant and highly probative of the crimes charged." (Doc. 1550 at 1.) First, membership in or

12  association with the AB is an element the charged crimes. (Doc. 1098 at 14-17.) *See* 9th Cir.

13  Manual of Model Crim. Jury Instr. 1.4. For example, evidence that the AB "has a reputation for

14  narcotics trafficking, murder, and assault, proves that Bannick and his co-defendants—members

15  and associates of the AB—were aware that their fellow members and associates would and did in

16  fact commit a series of crimes. Evidence about the AB, its reputation, and Bannick's association

17  with the enterprise, is therefore highly probative of the crimes charged in this case." (Doc. 1550 at

18  3.) Thus, the Government may outline what it expects the evidence to show in its opening

19  statement.

20       The Court will give several jury instructions that adequately address Defendants'

21  concerns.[12] For example, it will instruct the jury prior to opening statements that the statements

22  and arguments of the attorneys are not evidence, and more specifically, that what the attorneys

23  will say in their opening statements is intended to help the jury interpret the evidence, but it is not

24  evidence and is not to be considered in determining what the facts are. *See, e.g.,* 9th Cir. Manual

---

25  [12] Though the Court does not disagree with the general proposition that membership in the AB alone is not
26  sufficient evidence of conspiracy to commit crimes, the proposed instruction also fails to provide a
    complete and accurate statement of the law. While a person has the right to associate, this right does not
27  extend to criminal activity. *See, e.g.* California Penal Code § 186.22. The indictment alleges that a
    foundational core and unifying mission of the AB is criminal activity. Whether this is the case and whether
28  the defendants were a part of the alleged conspiracy is a question that the jury must determine based upon
    specific instructions on this topic.

1    of Model Crim. Jury Instr. 1.4; Instr. 1.11 ("An opening statement is not evidence. It is simply an

2    outline to help you understand what that party expects the evidence will show."). The Court will

3    also instruct the jury on the presumption of innocence at the outset of trial. Both the language of

4    that instruction and the sequence in which it is given are consistent with the Ninth Circuit's

5    Model Instructions. *See* Instr. 1.2. As the comments to Instruction 1.2 note, "[a]lthough the

6    Constitution does not require jury instructions to contain any specific language, the instructions

7    must convey both that a defendant is presumed innocent until proven guilty and that he may only

8    be convicted upon a showing of proof beyond a reasonable doubt." *Gibson v. Ortiz*, 387 F.3d 812,

9    820 (9th Cir. 2004). Only when a jury instruction "reduces the level of proof necessary for the

10   government to carry its burden is [it] plainly inconsistent with the constitutionally

11   rooted presumption of innocence." *Id.* Jurors are presumed to follow the Court's instructions.

12   *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *United States v. Reyes*, 660 F.3d 454, 468 (9th Cir.

13   2011). The Court will consider Mr. Bannick's objections to the jury instructions at the appropriate

14   time. The motion (Doc. 1454), joined in by Messrs. Stinson and Clement (Docs. 1465, 1475), is

15   **DENIED**.

16          **F.      Joint Motions in Limine of Messrs. Clement and Johnson (Docs. 1455, 1457)**

17                  1.      Motion to Exclude Prior "No Contest" Pleas and Convictions (Doc. 1455)

18          Messrs. Clement and Johnson seek to exclude the fact that they each entered no contest

19   pleas to, and were thereby convicted of, involuntary manslaughter in a prior state criminal

20   proceeding. (Doc. 1455.) According to the motion, the Government's preliminary exhibit list

21   includes abstracts of judgment from the underlying case along with a Custodian of Records

22   Certification from Kern County. (*Id.* at 2.) They argue that the Government intends to introduce

23   these documents to prove Defendants' guilt of overt act (b) of Count One of the indictment. (*Id.*;

24   *see* Doc. 1098 at 7 ¶ 20(b).)

25          Under Federal Rule of Evidence 410, nolo contendere pleas and convictions are

26   inadmissible against a defendant as proof that he or she committed the underlying crime(s)

27   charged. *See United States v. Nguyen*, 465 F.3d 1128, 1131 (9th Cir. 2006). A no contest

28   conviction is also barred by the rule against hearsay. Fed. R. Evid. 802; *see Nguyen*, 465 F.3d at

1131-32 (holding that the hearsay exception under Rule 803(22) does not apply to a final judgment based on a plea of nolo contendere and Rule 803(8) does not make such a conviction admissible as a public record because it would render Rule 803(22) superfluous).

With that said, the Government does not challenge that it may not use the convictions in its case-in-chief. (Doc. 1546 at 1.) Instead, it accurately contends that such convictions may be used for impeachment purposes. (*Id.*) Federal Rule of Evidence 609 provides that a felony conviction "must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant." This is true notwithstanding the fact that the convictions were based on no contest pleas. *See Dibbern v. City of Bakersfield*, 2024 WL 3993196, at *9 (E.D. Cal. Aug. 29, 2024) (citing *Brewer v. City of Napa*, 210 F.3d 1093, 1096 (9th Cir. 2000) (observing that a felony conviction otherwise admissible for impeachment under Rule 609 is not made inadmissible merely because it was obtained by a nolo contendere plea)). Therefore, in the event Mr. Clement or Mr. Johnson chooses to testify at trial, evidence of these convictions is admissible to attack his credibility on cross-examination. The motion (Doc. 1455) is **DENIED**.

### 2. Motion to Exclude Inflammatory Death Images (Doc. 1457)

Messrs. Clement and Johnson seek exclusion of many "unduly evocative or gruesome photographs of injuries or autopsies" taken during the investigation of this case under Federal Rule of Evidence 403. (Doc. 1457 at 2.) Their motion is joined in by Messrs. Stinson[13] and Bannick. (Docs. 1465, 1488.)

The motion asserts that the "numerous" images of the deceased identified by the Government in its preliminary exhibit list are unduly prejudicial and unnecessary to be considered by the trier of fact, particularly because the manner of death of the deceased individuals is not in dispute. (Doc. 1457 at 2.) Defendants also assert there are alternative methods to prove the location of the wounds, such as by the testimony and/or scale diagrams of the investigators, law enforcement personnel, and autopsy pathologists. (*Id.* at 3.) Thus, Defendants argue the

---

[13] Mr. Stinson joins in the motion as to its legal reasoning and to the extent that it applies to photographs of one of the murder victims. (*See* Doc. 1465 at 1-2.) Counsel indicates that the parties will resolve any disputes related to these photographs without the Court's involvement.

1   Government "seeks to admit the graphic photographs to unfairly indoctrinate the jury and arouse

2   intense passion against Messrs. Clement and Johnson." (*Id.* at 2.) To the extent the Court does not

3   exclude the photographs in their entirety, Messrs. Clement and Johnson ask that it limit the risk of

4   prejudice by prohibiting the Government from repeatedly showing the photographs to the jury,

5   demonstrating them on a "big screen," or using them during opening statements and/or closing

6   arguments. (Doc. 1457 at 5.)

7          The Government responds that the crime scene and autopsy photos will "prove that the

8   victims were killed with malice aforethought, an element of crimes charged, because they show

9   the killings were intentional, not accidental." (Doc. 1545 at 2-3.) It also contends this evidence is

10   "critical" to prove that the murders were racketeering acts committed on behalf of the AB. (*Id.* at

11   3.) And while this type of evidence is inherently prejudicial, unnecessary graphic photos may

12   result in *undue* prejudice. Death images "may appeal to the jury's sympathies, arouse jurors'

13   sense of horror, provoke a jury's instinct to punish, and trigger other intense human reactions."

14   *See Silva v. Chung*, 2019 WL 2195203, at *3 (D. Haw. May 21, 2019); Weinstein's Federal

15   Evidence § 403.04[1][c]; *see also Sanchez v. Jiles*, 2012 WL 13005996, *5 (C.D. Cal. June 14,

16   2012) (explaining that with autopsy photos, "[t]here is a strong possibility that such photographs

17   will inflame the jury's sympathies and distract them from the relevant issues in dispute," and

18   excluding cumulative and inflammatory photos).

19          The Government states it has noticed approximately 244 photos as potential exhibits, but

20   it has not identified which photographs it may seek to be admitted as evidence. For this reason,

21   the Court finds it would be more appropriate to balance the issues of relevance, prejudice, and

22   cumulative effect during the presentation of related testimony at trial. Accordingly, until such

23   time as the Government seeks to introduce this photographic evidence, the Court **RESERVES**

24   ruling on the motion. Before any party seeks to introduce the photos, the offering party **SHALL**

25   address the issue with the Court outside the presence of the jury. The Court anticipates that no

26   more than about a dozen photos as to each victim will be necessary and expects that each

27   proffered photo will have a legal justification.

28   ///

1    **G.    Mr. Stinson's Motion in Limine to Limit Testimony of Witness-71 (Doc. 1570)**

2          Mr. Stinson seeks to exclude certain areas of testimony that the Government's proposed

3    "Witness 71" is anticipated to offer at trial. (Doc. 1570 at 1-2.)[14] The Government opposes the

4    motion. (Doc. 1638.)

5          Prior to being charged in Count One of the Third Superseding Indictment, Mr. Stinson

6    asserts that W-71 was interviewed by counsel for the Government, case investigators, and a

7    member of the CDCR. (Doc. 1570 at 5.) Mr. Stinson claims that in the interview W-71 "discussed

8    his opinion of Mr. Stinson's status in the Aryan Brotherhood and his opinion regarding Mr.

9    Stinson's participation certain in [sic] predicate acts to [C]ount 1," including those identified in

10   paragraph sections 20(d), 20(e), and 20(t) of the indictment. (*Id.*) Mr. Stinson contends W-71 also

11   "discussed other crimes that he committed, and he implicated Mr. Stinson in some of those

12   uncharged crimes." (*Id.* at 6.) Mr. Stinson raises several issues about testimony he anticipates W-

13   71 will offer in light of the disclosed interview.[15]

14          1.    W-71's statement(s) that he was ordered by Mr. Stinson to commit murder

15               and assaults

16          Mr. Stinson anticipates that W-71 will testify that he was ordered by Mr. Stinson to

17   commit murder and assaults. Mr. Stinson objects that these crimes have not been noticed by the

18   Government or alleged in the indictment. (Doc. 1570 at 6–9.) Therefore, Mr. Stinson argues that

19   eliciting testimony referencing these "prior bad acts" should be excluded under Rule 403 as

20   unfairly prejudicial and under Rule 404(b) because the Government did not provide notice under

21   Rule 404(b)(3) and no permitted use of such evidence applies under Rule 404(b)(2). (*Id.* at 8-9.)

22          As to relevance and Rule 403, evidence is relevant and admissible if it has "any tendency

23

---

24   [14] As the Government points out (*see* Doc. 1638 at 1–2), this motion was filed more than two weeks past
     the relevant deadline. In an unauthorized reply brief (Doc. 1650), Mr. Stinson contends that the subject of

25   these motions was not disclosed to the defense until after the November 30, 2024 deadline for filing
     motions in limine. (*See* Doc. 1650.) The Court has therefore addressed the motion on its merits.

26   [15] In addition to the objections discussed herein, Mr. Stinson's notice of motion also appears to seek
     exclusion of any testimony offered by W-71 concerning Mr. Stinson's participation in a California

27   Employment Development Department fraud scheme, as well as his participation in a conspiracy to
     murder Victim 16. (Doc. 1570 at 2.) As the Government points out, Mr. Stinson offers no argument or

28   authority in support of these motions, (*see generally* Doc. 1570), which are therefore **DENIED**.

to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the outcome." Fed. R. Evid. 401. Moreover, "[r]elevant evidence is inherently prejudicial." *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (internal quotation omitted). Relevant evidence should only be excluded when its probative value is "substantially outweighed" by the danger of "unfair prejudice." Fed. R. Evid. 403. Here, the challenged statement(s) appear to be relevant under Rule 403 because they would make a fact of consequence—Stinson's knowledge of and participation in the RICO conspiracy and whether Stinson ordered lower-ranking members of the Aryan Brotherhood to commit crimes, including violent ones—more likely. This is indeed potentially prejudicial precisely because it will help prove the Government's case, but nothing presently before the Court suggests the prejudice will substantially outweigh the probative value. The Government is permitted to describe and prove the nature of the alleged conspiracy. The motion is **DENIED** on this ground, subject to renewal based upon the specific nature and scope of the testimony regarding violent acts not specifically alleged in the indictment.

The Rule 404(b) objection is also without merit. This anticipated testimony appears to be inextricably intertwined with the charged offenses. Accordingly, the ruling is the same as for related arguments above. *See supra* III.A.1. Any evidence that bears on the full scope of the conspiracy is inextricably intertwined with the charged acts or that is direct evidence of the crimes charged is not subject to the requirements under 404(b). As to any unnoticed 404(b) evidence that does not constitute the acts alleged in the indictment, whether as a predicate act or an act in furtherance of the substantive crime, Mr. Stinson's motion is **GRANTED**. As mentioned, the Government otherwise has significant latitude to introduce uncharged acts as direct evidence of the crimes charged.[16]

---

[16] At oral argument, counsel for Mr. Stinson pointed out that Mr. Stinson has already been convicted in a separate case on RICO charges related to the Aryan Brotherhood. Mr. Stinson suggested that there may be double jeopardy issues if the same conduct used to prove up that prior charge is also offered to prove up the charges in this case. This issue was not raised in the papers, so the Court is not at this time prepared to address how Mr. Stinson's prior conviction(s) may bear on the scope of the conspiracy evidence that may be presented in this case. The parties are directed to meet and confer on this issue and shall inform the Court if they believe further briefing is required.

2. W-71's statements regarding the murder of Victim-15 (Hargrave Murder)

The Government anticipates that the evidence at trial will show the Hargrave murder occurred in 2020 in retaliation for an attack on co-defendant Andrew Collins. (*See* Doc. 1638 at 5.) It is anticipated that W-71 will testify that he discussed this murder with Mr. Stinson and co-defendant Collins shortly after the murder occurred in April 2020 and that Collins told W-71, "we dropped that mother fucker." (*Id*.) Mr. Stinson objects to W-71 offering testimony regarding the murder on the ground that the testimony may consist only of "statements of a person retelling what he heard from another, then retelling and concluding that [Mr.] Stinson must have ordered [or] [a]pproved the murder." (Doc. 1570 at 8–9.) A statement is not hearsay, and is therefore admissible, if it is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Mr. Stinson contends that W-71's statements do not meet the requirements under Rule 801(d)(2)(E) because W-71 was informed of the murder after the fact by "a declarant who's [sic] own truth and veracity cannot be tested" at trial, which "formed the basis for [W-71's] implications of [Mr.] Stinson in a statement years after the death of [V-15]." (Doc. 1570 at 9-11.) Thus, Mr. Stinson argues the Government cannot prove by a preponderance of the evidence that a conspiracy existed between W-71 and Mr. Stinson, or that the statements were made "during the course and in furtherance of the conspiracy." (*Id.* at 10, quoting *Bourjaily v. United States*, 483 U.S. 171, 171 (1987).)

The Government represents that W-71 discussed the Hargrave murder with co-conspirators shortly after the murder. As mentioned, a statement may be in furtherance of a conspiracy if it "prompt[s] further action on the part of conspirators," are "made to 'reassure' members of a conspiracy's continued existence" or "allay a conspirator's fears," when they are made to report information to "higher ups" of the group, or when they are made to keep co-conspirators "abreast of an ongoing conspiracy's activities." *Yarbrough*, 852 F.2d at 1535–36 (collecting cases). At least as of now, the anticipated testimony appears to fall within at least one of those categories. Mr. Stinson's concerns about when W-71 formed his impressions as to what the statements of others meant can be addressed by cross examination and/or readdressed to the Court outside the presence of the jury as necessary. The motion is **DENIED** on this ground.

54

### 3.    Request for unredacted copy of W-71's CDCR autobiography

Mr. Stinson further requests an unredacted copy of the CDCR autobiography authored by W-71 as part of his gang disassociation process. (Doc. 1570 at 11-17.) He claims the statements made therein have evidentiary value—namely for purposes of impeachment. In the alternative, Mr. Stinson requests that the Court review the unredacted copy *in camera* to determine which portions, if any, may be disclosed to counsel. (*Id.* at 16-17.) Messrs. Clement and Johnson join in this request and add that full, unredacted autobiographies of any cooperating witnesses should be disclosed to the defense. (Docs. 1601, 1603.)

The Government opposes this request for several reasons. First, the Government apparently does not possess an unredacted copy of the autobiography. Second, the Government contends that the Defense has no right to an unredacted copy, which was generated as part of a formal debriefing under an administrative process within the California prison system. (*See* Doc. 1638 at 8–9.) As the Government points out, California Regulations require the report to remain confidential. 15 Cal. Code Regs. § 3321(a)(5).

The fact that some aspects of the autobiography as to W-71 have already been disclosed undermines the Government's suggestion that other concerns cannot overcome the confidentiality interest. In an abundance of caution, the Government is ordered to subpoena an unredacted copy W-71's autobiography—and any other currently redacted autobiography produced in this case— to be produced to the Court on an expedited basis. The subpoena **SHALL** be issued **no later than January 10, 2025**. Court expects to receive the document or response by the CDCR, well in advance of testimony from the witnesses.

### 4.    Testimony about W-71's "Thoughts"

Mr. Stinson argues that by seeking W-71's "thoughts" during his interview as to why he thought Mr. Stinson was involved in the conspiracy to murder V-15, the Government may attempt to elicit improper expert testimony from W-71 at trial. (Doc. 1570 at 18-19[17].) The Government anticipates that W-71 will testify that he believes Stinson and Collins were involved

---

[17] In support of this argument, Mr. Stinson cites page 6 of a 21-page draft transcript attached to a sealed filing; it appears this is a citation error and that Mr. Stinson instead meant to cite page 6 of the separate 14-page transcript attached to the same sealed filing. (Doc. 1594 at 28–29.)

1   in the Hargrave murder in part because W-71 interpreted the "we" in Collins' statement to W-71

2   that "we dropped that mother fucker" to be Stinson and Collins. (*See* Doc. 1638 at 7.)

3          Admission of this testimony is governed by Federal Rule of Evidence 701, which provides

4   that lay witness testimony in the form of opinions or inferences is admissible if it is: "(a)

5   rationally based on the witness's perception; (b) helpful to clearly understanding the witness's

6   testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other

7   specialized knowledge within the scope of Rule 702." This rule can be applied to an informant's

8   testimony about his understanding of the meaning of conversations between himself and others.

9   *See United States v. Lewis*, 727 F. App'x 304, 305 (9th Cir. 2018) (affirming admission under

10  Rule 701 of informant's interpretations of statements made in recorded conversations because it

11  helped the jury understand "ambiguous statements and translat[e] drug jargon" and ultimately

12  "assisted the jury in understanding [the defendant's] involvement in distributing and conspiring to

13  distribute methamphetamine and crack cocaine").

14         The Government proffers that W-71 will testify that his interpretation is based on personal

15  conversations with Messrs. Stinson and Collins; his personal relationship with them; his personal

16  knowledge of the way Aryan Brotherhood members speak to each other; his personal knowledge

17  of Aryan Brotherhood rules and operating procedures; and his personal knowledge of the Aryan

18  Brotherhood members incarcerated in the prison where Hargrave was murdered. (*Id.*) Based on

19  this representation, the anticipated testimony appears to satisfy the requirements of Rule 701 as it

20  will be based on personal knowledge; will be helpful in determining various facts in issue,

21  including why Hargrave was murdered at that time and location and who was involved in the

22  murder; and no technical material subject to Rule 702 is involved. Mr. Stinson's motion is

23  **DENIED** on this ground. However, the Government will have to lay the Rule 701 foundation and

24  W-71 will not be permitted to opine as to any Defendant's thought process. The Government is

25  instructed to notify the Defense and the Court prior to the introduction of any testimony that may

26  fall close to this line, so that the Court may rule on any objections outside the presence of the

27  jury.

28  ///

1    **IV.    CONCLUSION AND ORDER**

2    Based upon the foregoing, the Court **ORDERS**:

3    1.    The Government's motion in limine to exclude defense experts Dr. Neuschatz and

4          Robert Ayers (Doc. 1448) is **GRANTED**.

5    2.    The Government's motion in limine to exclude defense experts (Doc. 1558) is

6          **DENIED** as to Brian Chase, **DENIED as moot** as to Angela Malley, and

7          **DENIED** as to Natasha Powers-Marakis.

8    3.    The Government's motion in limine to conditionally admit co-conspirator

9          statements (Doc. 1446) is **GRANTED IN PART**.

10   4.    The Government's motion in limine to preclude reference to predicate acts (Doc.

11         1447) is **GRANTED in part**.

12   5.    Mr. Johnson's motion in limine to exclude unnoticed 404(b) evidence (Doc. 1442)

13         is **GRANTED in part**, as outlined above.

14   6.    Mr. Johnson's motion in limine to exclude or limit Government exhibits (Doc.

15         1441) is **DENIED as moot.**

16   7.    Mr. Clement's motion in limine to exclude cell search evidence (Doc. 1649) is

17         **RESERVED**.

18   8.    Messrs. Clement and Johnson's joint motion in limine to prohibit expert testimony

19         through lay witnesses (Doc. 1458) is **DENIED**.

20   9.    Messrs. Clement and Johnson's joint motion in limine to prohibit overview and

21         summary testimony (Doc. 1456) is **DENIED** as to overview testimony and

22         **RESERVED** as to summary testimony.

23   10.   Messrs. Clement and Johnson's joint motion in limine to preclude testimony

24         regarding Cellebrite and historical cell site data testimony (Doc. 1460) is

25         **DENIED**.

26   11.   The motions in limine to preclude or limit testimony of gang expert Steven Slimp

27         (Docs. 1452, 1459) are **DENIED**.

28   12.   Messrs. Clement and Johnson's joint motion in limine to exclude prior "no

contest" pleas and convictions (Doc. 1455) is **DENIED**.

13.    Messrs. Clement and Johnson's joint motion in limine to exclude inflammatory death images (Doc. 1457) is **RESERVED**.

14.    Mr. Stinson's motion in limine (Doc. 1570) is **GRANTED in part** and **DENIED in part**, as outlined above.

15.    Mr. Bannick's motion in limine to play unconscious bias jury video (Doc. 1453) is **DENIED**.

16.    Mr. Bannick's motion in limine to include a gang membership jury instruction (Doc. 1454) is **DENIED**.

Counsel **SHALL** discuss the rulings with their clients and witnesses to ensure compliance with this order.

IT IS SO ORDERED.

Dated:   **January 8, 2025**

UNITED STATES DISTRICT JUDGE