UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20-CR-00238-JLT-SKO |
| Plaintiff, | ORDER DENYING THE MOTIONS FOR JUDGMENT OF ACQUITTAL BY DEFENDANTS JOHNSON, CLEMENT AND STINSON |
| v. | |
| KENNETH JOHNSON, et al, | |
| Defendants. | |

After the government rested its case, the defendants moved for judgments of acquittal. The defendants argue that because no witnesses directly pointed them out and identified them during trial, the government failed to prove an essential element of its case. They asserted also very generally, that they were entitled to judgments of acquittal as to the remaining merits of the case. For the reasons set forth below, the motions are **DENIED**.

**I.      The defendants have failed to demonstrate they are entitled to judgment in their favor.**

According to Federal Rules of Criminal Procedure Rule 29, the court may grant a motion for judgment of acquittal only if, viewing the evidence in the light most favorable to the government, "no rational trier of fact could find beyond a reasonable doubt that the defendant is the person who committed the charged crime." *United States v. Lucas*, 963 F.2d at 243, 247 (9th Cir. 1992) "The government is entitled to all reasonable inferences that can be drawn from the

evidence." *Id.*

In *United States v. Alexander*, 48 F.3d 1477, 1490 (9th Cir. 1995), the Ninth Circuit held that identification of the defendant is "always" a necessary element of the charged offense. The Court cautioned, however, that in-court identification is not required and "[i]dentification can be inferred from all the facts and circumstances that are in evidence." *Id. Alexander* agreed with other circuits that a witness "'need not physically point out a defendant so long as the evidence is sufficient to permit the inference that the person on trial was the person who committed the crime.' *United States v. Darrell*, 629 F.2d 1089, 1091 (5th Cir.1980)." *Id.*

In this case, no witness pointed to the defendants and identified them as those who committed the charged crimes. However, Los Angeles County Sheriff's Detective Knieriem, testified that he had become familiar with those involved in the investigation, which started in December 2019, into the Aryan Brotherhood, including the defendants. (Doc. 1751 at 10-11) He testified that he became familiar with them through his own experience with them, through his work in the prison gang unit of the Los Angeles County Sheriff's Department, through talking with the targeted people himself and through talking with personnel of other agencies, including the California Department of Corrections and Rehabilitation. *Id*. He then identified photos of each of the defendants, each of which were admitted without objection, and testified as to their nicknames. *Id*. at 11-14, 25, 26. [1]

Troy Clowers testified that he knew John Stinson and Kenneth Johnson. (Doc. 1751 at 44-45, 46-47.) He began speaking with Stinson via a cell phone in about 2020 or 2021 and with Johnson first in 2018 and again in 2020. (Doc. 1751 at 44-45, 46-47, 72, 73-74) He reported that Mr. Stinson eventually sponsored him to become a "made member" of the Aryan Brotherhood. *Id*. at 44, 66-67, 69. Due to their made-member status with the AB, Clowers would share with Stinson and others the proceeds he earned from his various criminal activities. *Id*. at 73-76, 105-106. He also arranged to have drugs sent to Johnson on one occasion. *Id*. He identified the nicknames for Stinson and Johnson. *Id*. at 45, 148. He also committed EDD fraud on behalf of the

---

[1] Though it has little bearing on this motion, counsel conceded while cross-examining Detective Knieriem that the photo identified by Detective Knieriem *was* Mr. Stinson. *Id*. at 28-29.

2

1  AB, including obtaining benefits for both Stinson and Johnson.

2  James Field testified that he knew Mr. Johnson and Mr. Clement. (Doc. 1763 at 16-17) He testified that he was in "personal communication" with Johnson and Clement in 2022 via cell phone and knew their nicknames. *Id*. He had seen Clement on video calls and knew it was him because he had spoken to him by phone before and because another AB member said that the person on the video call was, in fact, Frank Clement. *Id*. at 27-28, 107-108. Field provided messages he exchanged with Clement and Johnson using his cell phone. *Id*. at 66-67, 69-70, 71-72.

Field testified that he was directed by Clement to commit a robbery in the Hollywood Hills and to murder Micheal Brizendine, which he did. *Id*. at 28-32, 34-43, 44-50, 111-113. Field testified that Clement told him to collect money from Evan Perkins that Clement decided that Perkins owed him because Perkins failed to succeed at committing EDD fraud on the scale that Clement wanted. (Doc. 1763 at 50-58, 50-51) In connection with this, Clement also instructed Field to kill James Yagle and Ronald Ennis. *Id*. at 72-100, 102-108. Field testified that he, Brandon Bannick and Evan Perkins drove Yagle and Ennis to a remote spot where Field shot and killed Yagle while Field was on the phone with Clement. *Id*. While speaking to Clement as the scene of the murders, Clement commented to Fields about hearing Ennis screaming after he had been shot by Brandon Bannick and Evan Perkins. *Id*.

Lana Hailey testified that, though she did not know Mr. Johnson or Mr. Clement personally, she had spoken to both on the telephone. (Doc. 1767 at 18-27) She was put in touch with them by Brandon Bannick, Justin Gray or Evan Perkins. *Id*. Johnson and Clement both told her that each was a member of the Aryan Brotherhood. *Id*. Clement accused Hailey of stealing from the Aryan Brotherhood and told her that she owed them $5,000. *Id.* She paid Clement the money and committed a theft because Clement told her to do it, and she was afraid that she would be hurt if she didn't do it. *Id.*

Hailey testified that Allan Roshanski was committing EDD fraud at the time of his murder. (Doc. 1767 at 22-24) In one conversation with Clement, Clement told her that they were going to kill Roshanski and, not long after, Justin Gray told her than he killed Roshanski. *Id*. at

3

1  27-28. In a later call, Clement took credit for having Roshanski killed. *Id*. at 28.

2  Robert Eversole testified that he knew Johnson, Clement and Stinson. (Doc. 1767 at 152-
3  156) His testimony supported that John Stinson was a member of the three-man commission,
4  which oversees the AB enterprise. *Id*. Eversole was a close friend of Johnson and Stinson and an
5  associate of Clement and spoke to them often by voice and video calls. *Id*. 152-156, 157-158,
6  199-200

7  Eversole testified about the various criminal activities he was involved in on behalf of the
8  AB. *Id*. at 162, 163-164, 197-201; Doc. 1777 at 164. He committed these crimes and acts of
9  violence on the orders of the AB and gave orders and relayed orders from members of the AB to
10 others to have crimes and violence committed. *Id*. at 164-167; Doc. 1777 at 16. He did this
11 because if he did not, he would be the target of violence, including murder. (Doc. 1767 at 164-
12 167.) In particular, he testified that Johnson and Clement were involved in various forms of fraud
13 through Evan Perkins and others. *Id.* at 158-159, 202. He also discussed the murder of Allan
14 Roshanski. *Id.* He testified that Johnson had learned that Roshanski was committing large-scale
15 EDD fraud and told Eversole to find out whether Roshanski was affiliated with any gang. *Id*.
16 201-213. When Eversole discovered that Roshanski was not affiliated with a gang, the AB,
17 including Johnson and Clement, determined that Roshanski needed to pay a percentage of money
18 earned from the fraud to the AB as "protection." *Id*.; Doc. 1777 at 19-20.

19 During this process, Roshanski treated Clement with disrespect, which resulted in Johnson
20 ordering Justin Gray to kill Roshanski. (Doc. 1767 at 20-213) The plan was for Gray to meet with
21 Roshanksi, kill him, and steal a bag from him, which Johnson and Clement believed would
22 contain EDD debit cards. *Id*. Clement told Eversole to help Gray plan out how the murder would
23 occur. *Id*. at 208-213; Doc. 1777 at 18-19, 166-169, 170.

24 Eversole also testified that Clement and Johnson ordered that an AB associate, Brandon
25 Lowrey, be murdered. (Doc. 1777 at 20-23) He testified that AB associate Thrasher Holmeyer
26 murdered Lowrey because Johnson told Holmeyer to do it. *Id*.

27 Brian Rapinoe testified that he was an associate of the Aryan Brotherhood. (Doc. 1777 at
28 181) In that capacity he knew and worked for John Stinson, including committing crimes for him

4

1    and the AB, including wide-scale EDD fraud. *Id*. at 181-183, 184-187, 188-191, 197-202; Doc.
2    1786 at 30-. He also knew Kenneth Johnson. (Doc. 1777 at 184. When Rapinoe acted as a paid
3    informant for the ATF, he engaged in audio and video conversations with Johnson in which the
4    two discussed Johnson selling various pound-quantities of methamphetamine to him. *Id*. at 204-
5    211. Johnson gave him prices and Rapinoe agreed to buy the drugs, but the drug purchase did not
6    occur. *Id*.; Doc. 1786 at 29-30.

7    Brandon Bannick testified that became associated with the AB when he entered state
8    prison and described the rules, activities and crimes of the AB. (Doc. 1786 at 117-121) He
9    testified that, among other AB members and associates, he knew Clement and Johnson and knew
10   their nicknames. *Id*. at 123-125. He had been in personal communication with both. *Id*. He knew
11   others who committed crimes for John Stinson. (Doc. 1786 at 121-122)

12   In 2020, Bannick learned that Justin Gray was ordered by Clement and Johnson to kill
13   Allan Roshanski. (Doc. 1786 at 126-134) Johnson told him to go with Gray and assist him, in
14   what turned out to be the murders of Roshanski and Ruslan Megomedgadzhiev. *Id*. He did so
15   because Bannick owed Johnson money. *Id*. at 134-140. Gray told Bannick that Johnson and
16   Clement ordered the murder because Roshanski had disrespected Clement. *Id*.

17   Bannick also testified that he was present when James Yagle and Ronald Ennis were
18   murdered and, in fact, shot Ennis six times. (Doc. 1786 at 141 –166, 179-181) Bannick testified
19   that Clement ordered them to murder Yagle and Ennis. *Id*. at 156, 167-168, 169-170.

20   Daniel Rubin testified that he was an associate of the AB and explained the rules of the
21   enterprise. (Doc. 1793 at 55-58, 64-73) He testified that he knew John Stinson, Kenneth Johnson
22   and Francis Clement through his cellmate and that he spoke to each of them by telephone. *Id*. at
23   58-61, 74-76, 77-78, 80, 89, 133. He described the criminal activities of the AB in and out of
24   prison. *Id*. at 61-73, 82, 94-99, 102-112. When he earned money, he paid a percentage to John
25   Stinson. *Id*. at 66-67. John Stinson ordered him to kill an AB member, Yandell, though he didn't
26   do it because Yandell was kept in administrative segregation and Rubin could not get to him. *Id*.
27   at 112-113. Stinson also ordered that AB member Andrew Collins be murdered. *Id*. at 113-115.
28   Stinson told him to find someone who could kill Collins, but the AB did not have a person where

1  Collins was being housed who could do it. *Id*. Stinson spoke to a leader in the Mexican Mafia to
2  have them kill Collins, but that group would not do it. *Id*.

3  After considering this evidence and the entirety of the evidence presented by the
4  government, the Court finds that the motions must be denied. Rule 29 requires the Court to
5  evaluate the evidence in the light most favorable to the government and deny the motion it finds
6  that no "rational trier of fact could find the essential elements of the charged crimes beyond a
7  reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010). Though the
8  Court has summarized only very broadly *some* of the evidence admitted at trial, it is apparent that
9  there was sufficient evidence to support each of the elements of the charged crimes and sufficient
10 evidence that the defendants committed those crimes. *Alexander*, 48 F.3d at 1490. Though no
11 witness pointed at each defendant and spoke their names, the evidence was sufficient to for the
12 trier of fact to infer that the defendants were the people who committed the crimes. *Darrell*, 629
13 F.2d at 1091. Thus, the motion is **DENIED.**

## ORDER

For the reasons discussed, the Court **ORDERS**:

1. The oral motions of the defendants for judgments of acquittal under Rule 29, are **DENIED**.

IT IS SO ORDERED.

Dated:     **February 22, 2025**

UNITED STATES DISTRICT JUDGE